## 61368. BLOUNT v. MOORE.

CARLEY, Judge.

Appellant, plaintiff below, brought suit against appellee-physician for the allegedly negligent performance of a surgical operation which resulted in appellant's blindness. A verdict for appellee was returned by the jury and judgment was entered thereon. Appellant appeals.

1. Several of appellant's enumerations of error are premised upon the giving of the following jury charge which was requested by

appellee: "[T]he law recognizes that medicine is an inexact science at best and that all a doctor may do is assist nature in accordance with the present state of medical experience." Appellant urges that this charge is an incorrect proposition of law, that it is argumentative and that it is inappropriate and misleading. The crux of the assertion of error in the charge is that its language tends to weaken or liberalize the application of the standard of professional care required of physicians.

The exact language of the contested charge appears in *Hayes v. Brown,* 108 Ga. App. 360 (133 SE2d 102) (1963). Resolution of the issues presented in the instant appeal mandate that we examine that language in the entirety of the context in which it appears, Division 1 of *Hayes.* Therefore, that division of *Hayes* is set out below:

"The basis for a malpractice action is provided in Code § 84-924 which provides: 'A person professing to practice surgery or the administering of medicine for compensation must bring to the exercise of his profession a reasonable degree of care and skill. Any injury resulting from a want of such care and skill shall be a tort for which a recovery may be had.' The degree of care and skill required is that which, under similar conditions and like surrounding circumstances is ordinarily employed by the profession generally. [Cits.] The court and jury must have a standard measure which they are to use in measuring the acts of a doctor to determine whether he exercised a reasonable degree of care and skill; they are not permitted to set up and use any arbitrary or artificial standard of measurement that the jury may wish to apply. The proper standard of measurement is to be established by testimony of physicians, for it is a medical question. [Cits.]

"A doctor is not an insurer and an unintended result does not raise even an inference of negligence. 'A physician can not always effect a cure.' [Cit.] *The law recognizes that medicine is an inexact science at best and all a doctor may do is to assist nature in accordance with the present state of medical experience.* 'The fact that treatment has resulted unfavorably does not raise even a presumption of want of proper care, skill, or diligence.' [Cits.] It is also well established in this jurisdiction that 'the presumption is that the medical or surgical services were performed in an ordinarily skillful manner.' [Cit.]" (Emphasis supplied.) *Hayes v. Brown,* 108 Ga. App. 360, 363 (1), supra.

It is noted that the first paragraph of Division 1 of *Hayes,* quoted above, sets the standard by which the acts and actions of a doctor must be measured in a medical negligence case: the degree of care and skill as established by medical testimony which, under similar conditions and like surrounding circumstances, is ordinarily

employed by the profession generally. The second paragraph, however, does not concern the standard by which a jury must review particular acts, actions or conduct of a doctor charged with medical negligence but, rather, deals with the law's acknowledgment that *if* the physician has otherwise met the standard set forth, the fact that his compliance with that standard did not achieve a satisfactory result cannot be the basis for imputation of negligence liability. In other words, the second paragraph of Division 1 of *Hayes* establishes that the result of a medical treatment is not a consideration in the determination of whether it was performed negligently. Thus, from an academic and analytical viewpoint, the language of the charge under scrutiny in the instant case was properly positioned within the text of the *Hayes* opinion. In that context — result — the language is a correct statement of the law for, abstractly, it is a gratuitous preface to the rule that no inference of malpractice may be drawn from unfavorable treatment. In this regard, it is noted that the charge in the instant case was given immediately before an instruction that an unfavorable result does not raise a presumption of lack of care, skill and diligence. However, even conceding that *in the context of Hayes* the language employed reflects a mere elaboration on the well established principle of law that a doctor is judged by conduct and not result, that fact alone does not render it appropriate as a jury instruction on that principle. "[L]anguage which would be proper in a headnote or in the opinion by a reviewing court may be improper when embodied in a charge to a jury, and the fact that the excerpt was taken verbatim from a decision of this court did not make the giving of it proper." *Bonita Theatre v. Bridges,* 31 Ga. App. 798, 805-806 (122 SE 255) (1924).

This court in the second sentence of the second paragraph of the *Hayes* decision was merely undertaking to make clear the legal principle upon which is founded the rule of law that malpractice may not be inferred from an unfavorable result—medicine is an inexact science at best. In this regard, it is appropriate to an appellate decision reviewing the evidence in a malpractice case but could not possibly enlighten a jury of fact finders on the objective standard of care required of a physician. Indeed, the sentence, if charged as written as was done in the instant case, is susceptible of being understood as imposing a lesser standard on physicians than the required degree of skill. However, the intent of the second paragraph of *Hayes* is not to imply a lesser standard of care for physicians than is established in the first paragraph — which is that a doctor must exercise that degree of care and skill ordinarily employed by the profession generally while assisting nature in accordance with the present state of medical experience. We believe that an instruction on

the principle that a physician is judged by conduct and not by result should be more objectively phrased than that given in the instant case. Absent a qualification as to the necessity that a doctor exercise the care and skill ordinarily employed by the profession generally, we are therefore compelled to conclude that the verbatim language of the second sentence of the second paragraph of Division 1 of *Hayes* is not adaptable as a jury instruction and should not be included in a charge in a malpractice case because it is argumentative, inappropriate and misleading. The charge in the instant case was, therefore, erroneously given.

However, a review of the entire charge demonstrates that the jury was carefully and repeatedly otherwise informed of the correct standard which they were to apply in determining whether appellee was negligent. For this reason, and this reason alone, the error was harmless. See *Bonita Theatre v. Bridges,* 31 Ga. App. 798, 806, supra.

2. During the course of the trial a C-arm fluoroscope machine, the same machine used during appellant's operation, was demonstrated before the jury. This demonstration was conducted by fluoroscoping a bare skull. Because a bare skull was used instead of the skull of a living person, appellant contends that the demonstration was dissimilar to the actual circumstances of her operation. Appellant made other objections based upon appellee's failure to show that the operating condition and repair and maintenance of the machine was the same at the time of demonstration as during appellant's operation. We find no error for any reason urged on appeal. The same machine was used and substantially the same conditions existed at the demonstration as at the operation except for the use of a bare skull. In matters concerning demonstrations such as this the trial court has broad discretion and it was not abused in the instant case. *Atlanta & W. P. R. Co. v. Hudson,* 2 Ga. App. 352 (58 SE 500) (1907); *Watson v. Elberton-Elbert County Hosp. Auth.,* 125 Ga. App. 112 (186 SE2d 459) (1971).

3. Use by the trial court of the term "guilty" in referring to appellee's alleged culpability for malpractice did not constitute reversible error. While it is clearly the better practice not to make use of the word in the context of a civil action, "guilty" is not necessarily restricted to criminal culpability. See Black's Law Dictionary (4th Ed.) p. 836. We cannot say, therefore, that use of the term was so confusing or misleading as to constitute error.

4. Appellant contends that it was error to grant appellee partial summary judgment as to that count of her complaint which alleged appellee's failure to disclose the risks and dangers involved in undergoing surgery.

"The legislature has defined the physician's duty of disclosure

to his patient; the physician must inform the patient of the general terms of treatment in order to effect a valid consent. [See Code Ann. § 88-2906] In that we have decided that this duty does not include a disclosure of 'risks of treatment,' appellant cannot sustain an action alleging that defendant breached his duty in failing to warn of the risks of treatment or that her consent was thereby rendered invalid." *Young v. Yarn,* 136 Ga. App. 737 (1) (222 SE2d 113) (1975). Therefore, under *Young,* appellant's contention that appellee would be liable if he negligently breached a duty to disclose specific risks and dangers of treatment is without merit.

*Judgment affirmed. Quillian, C. J., Banke and Pope, JJ., concur. Deen, P. J., Birdsong and Sognier, JJ., concur specially. McMurray, P. J., concurs in the judgment only. Shulman, P. J., dissents.*

DECIDED JUNE 26, 1981 —

*Edward J. Walsh, Larry S. McReynolds, Gail M. Payton,* for appellant.

*Michael T. Bennett, Sidney F. Wheeler, Barry S. Mittenthal,* for appellee.

*Don C. Keenan, Ed G. Barham,* amicus curiae.

DEEN Presiding Judge, concurring specially.

While agreeing completely with all that is said in Divisions 2, 3 and 4 of the majority opinion, exception is respectfully taken to conclusions drawn in the 1st Division.

The charge, "The law recognizes that *medicine* is an inexact *science* at best and that all a doctor may do is assist *nature* in accordance with the present state of medical experience," is appropriate in this case. (Emphasis supplied.) It might well be argued that failure to give this charge upon request in all malpractice cases may be error. " 'Medicine is an experimental, not an exact, science.' " *Bennett v. Ware,* 4 Ga. App. 293, 299 (61 SE 546) (1908). Science generally means possessed of knowledge as distinguished from ignorance and specifically points to truths or laws that may be experimentally demonstrable and empirically tested. Nature is a creative, controlling inner force or sum of such forces in an individual and in the universe. *Websters Seventh New Collegiate Dictionary,* 1963 Edition. *Stancil v. State,* 155 Ga. App. 731, 732 (272 SE2d 511) (1980).

Medicine, like law and most other areas of general knowledge in its totality, is not pure or exact science. Math, physics and chemistry

are examples of knowledge closer to, in their totality, an exact science. Certain parts of a given area of a discipline of study may be classified as exact, such as the laws of gravity, motion, friction, momentum, force and acceleration, cause and effect, biogenesis, conservation, entropy, centrifugal force, all of which by observation and demonstration can be repeated over and over under similar conditions and can be falsified. Judicial notice may be taken of these examples of exact or pure science. *Rome R. & Light Co. v. Keel,* 3 Ga. App. 769 (60 SE 468) (1907). *Woods v. Andersen,* 145 Ga. 492, 496 (243 SE2d 748) (1978) *Green, Ga. Law of Evidence, 11,* Judicial Notice of Law § 5. *Cornett v. Agee,* 143 Ga. App. 55 (237 SE2d 522) (1977). Compare *Irwin v. Torbert,* 204 Ga. 111, 125 (49 SE2d 70) (1948), admonishing courts not to take judicial notice of anything "that is subject to be disproved."

It is my opinion that portions within the field of medicine in the present state of medical experience, such as taking of a patient's temperature, blood pressure or blood type have evolved from inexact to exact procedures or methodology. This does not mean that all parts of medicine, or medicine in its totality, are exact testable science. An example of highly inexact speculative treatment within medicine is pointed out in the testimony in the case sub judice. One of the doctors stated that the chances were 85 to 90 percent that the radiation treatment would adversely affect the spinal column and the cord and would cause paralysis or cause her to become a paraplegic. This meant, as to this particular patient, that this type of treatment would be only 10 to 15 percent exact. The result might be more exact, as to success, if the same treatment were applied to a different part of the patient's body. All that the trial judge has done, in effect, is to indicate to the jury that (1) a physician cannot guarantee a cure, (2) that he is required to do his best as to care and skill as is ordinarily employed by the profession generally while assisting nature (inner inherent forces and powers beyond the natural) in the healing processes within the body. Without the charge, under consideration, as given, it could be articulated that the duty of a physician "places an impossible burden on medical practice . . ." *Banks v. Dalbey,* 150 Ga. App. 779, 784 (258 SE2d 701) (1979) (dissenting opinion) overruled by the Supreme Court in *Dalbey v. Banks,* 245 Ga. 162 (264 SE2d 230). In my dissent when the latter case was before this court, I tried to point out differences and distinctions between three concepts of medical liability: (a) total liability, (b) unlimited liability and (c) limited liability. The applicability and adoption by many in today's society of the limited liability philosophy has encouraged the proneness and proliferation of malpractice suits. All of this has a bearing on the exactness or inexactness of medicine as a science, care

and skill ordinarily employed by the profession in relation to the present state of medical experience, at least as viewed in the eyes of the general public. The reasonable man or average person is the one in the final analysis who must weigh and decide as jurors between these speculatory, philosophical and inexact argument areas of medical liability as compared with recognition of particular parts of medicine attaining designation of exact science. The limited liability doctrine of societal educational overemphasis of heredity or environment as an influence and cause of individual problems without a balanced emphasis on the incipiency of the will as causal and influencing concepts is one reason the courts are logjammed, overcrowded and clogged with multiplicity of civil and criminal suits. If one is constantly told and educated that there are no right or wrong answers in making situational judgments as to legal and illegal events within problem solving and that heredity and environment are solely to blame — that they themselves then are not to blame — therefore someone else is to blame — hence one is more likely to sue others when adversity or medical problems arise, than if they are also told that they have a free will, can make a choice and themselves many times or most of the time, are responsible for their choices, injuries and damages occurring to person and property. Adoption of the limited liability philosophy is almost tantamount to community acceptance of medicine as an exact science notwithstanding what the courts have held, that it is inexact. However, this is a problem that addresses itself to society as a whole.

The real question in this case is the exactness or inexactness of radiation treatment. " — In 1955, despite the best efforts of cancer therapy, which happened to be surgery, radiation and chemotherapy, two out of every three cancer victims were destined to die of the disease, or, as was later determined, *the treatment of the disease.* — In 1980, and with a vastly accelerated effort in terms of both economic and man-hour resources involved in a government-sponsored effort to wipe out cancer, the statistics are still the same. And the *unimproved therapies* are still the same . . . [T]he authors would like to emphasize that cancer statisticians in this country have arbitrarily established a five-year survival figure as a 'cure,' . . ." *Jurimetrics Journal of Law, Science and Technology,* "The Laetrile Phenomenon — Harbinger of Medical Revolution," Robert W. Bradford and Michael L. Culbert, Vol. 21, No. 2, pp. 179, 180-181. (Emphasis supplied.)

The question of exactness or inexactness of science in this case is a hybrid law-science question. "A noted judge has written: Most importantly, science and law, in their broadest sense, encompass all there is for man, in his life and in his universe. Science embraces all

material things, and law, with its moral and philosophical underpinnings, embraces all the things of the spirit . . . Science seeks knowledge of facts; law seeks justice which may rise above and beyond the facts . . . Science rests on the material; law on the moral, ethical and philosophical. Science teaches us what we can do; law tells us whether we should . . . The blindfolded lady of justice, like many wives of dynamic men, has been a helpmate and a softening influence on her scientific partner from the time man crawled from the swamps until he walked on the moon. When the lady's counsel has been ignored, the purveyors of perverted science have ended by burning humans in furnaces and by making lampshades of human skin."[1] *Jurimetrics Journal of Law, Science and Technology,* "Human Rights Concerns of the Scientific and Legal Fraternities," Edward Gerjuoy, supra, p. 117, 126-127.

Unless a case deals exclusively with an exact or near exact science, questions as to an expert's answer and judgment can be significantly influenced by his outlook. ". . . [A]n expert's personal philosophy of socio-economic outlook may substantially affect his judgment." 40 FRD 33, 34. Resolutions of differing views of experts are better left to a jury of non-experts.

"Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs." Frye v. United States, 54 U. S. App. D. C., 293 F. 1013, 1014 (1923).

The charge was not error and I would affirm in all aspects.

SOGNIER, Judge, concurring specially.

I concur in Divisions 2, 3 and 4 of the majority opinion. I concur specially in Division 1 of the opinion.

In order to see the context in which the disputed charge was given, I deem it necessary to set out additional facts.

In 1972 in an attempt to curtail the spread of appellant's cancer, a surgical procedure called a radio-frequency hypophysectomy was performed on her. This operation involved the cauterization of the

---

[1] Howard T. Markey, Chief Judge, U. S. Court of Customs and Patent Appeals, *Science and Law; Toward a Happier Marriage,* a talk delivered in acceptance of the Jefferson Medal, reprinted in 59 J. Patent Office Soc. 343 (1977).

pituitary gland to partially reduce its functioning. While the patient continued to have symptoms of cancer, the spread of the disease was retarded, at least partially due to the radio-frequency procedure. Appellant was advised in 1977 that the cancer was spreading and that she needed radiation treatment, particularly for a tumor along her spinal column. In explaining the radiation treatment, appellant was advised that the radiation treatment might cause paralysis and she could become a paraplegic because of possible damage to her spinal column. Because of the danger, appellant rejected the radiation treatment and as an alternative, appellee recommended an operation called a trans-sphenoidal hypophysectomy. This operation involved the complete removal of the pituitary gland. Later testimony developed that in the opinion of some medical experts the patient would not have survived for more than six months to a year without the trans-sphenoidal hypophysectomy. While removal of the pituitary gland by the operation mentioned above was not an uncommon procedure, testimony was given that a surgical hypophysectomy following a radiofrequency hypophysectomy is a more unusual case. The defendant testified that in his opinion the prior radio frequency operation had scarred certain tiny arteries that supplied the optic chiasm. As the pituitary gland is located immediately adjacent to the chiasm, this scarring increased the possibility that in removing the pituitary gland these arteries which had become fixed by the earlier coagulation resulting from the radiofrequency treatment might be disturbed. The disrupting of these arteries caused an infarct of the optic chiasm which resulted in appellant's loss of vision. Generally, opinions differed on the cause of appellant's blindness, but the only *specific* cause of blindness was offered by the defendant, as stated above. There was no evidence that this condition (the scarring) was discoverable by x-ray or by the fluoroscope used, and was a condition which could have been reasonably anticipated before the operation. As a result of the operation, the patient was blinded but remains alive more than two and one-half years after the operation. From the standpoint of the treatment of cancer, some retardation of its continuous spread resulted from the trans-sphenoidal hypophysectomy performed on appellant.

In this case particularly, the charge "the law recognizes that medicine is an inexact science at best and that all that a doctor may do is to assist nature in accordance with the present state of medical experience," was proper. The charge was taken from the case of *Hayes v. Brown,* 108 Ga. App. 360, 363 (133 SE2d 102) (1963). The trial court went on to charge fully and completely on the duties, obligations and presumptions arising from medical treatment.

The phrase " 'Medicine is an experimental, not an exact, science' " is first found in *Bennett v. Ware,* 4 Ga. App. 293, 299 (61 SE 546) (1980), a malicious prosecution case involving the illegal practice of medicine. The phrase was taken by our Court of Appeals from Chief Justice Clark's opinion in State v. Biggs, 133 N. C. 729 (1903) (a prosecution for the illegal practice of medicine) and was quoted with approval in *Bennett.* The phrase in its present version is found in *Hayes v. Brown,* supra, (an action for medical malpractice against a surgeon, as distinguished from a physician) and has been changed from "not exact" to "inexact," and has been made contemporary by addition of the phrase "in accordance with the present state of medical experience." See also *Howell v. Jackson,* 65 Ga. App. 422, 423 (16 SE2d 45) (1941) for the genesis of the statement " '[a]ll we can do is to assist nature in her effort to heal the ailment.' " The majority states that "the sentence . . . is susceptible of being understood as imposing a lesser standard on physicians than the required degree of skill." To the contrary, when Judge Bell added the words "in accordance with the present state of medical experience," he anticipated correctly that the jury, based on the evidence, could determine the skill, care or diligence exercised by the surgeon under "the present state of medical experience." In this case the evidence discloses a difficult operation, an unusual situation, and an unanticipated complication. I find the charge was adjusted to the evidence. The facts themselves demonstrate the inexactitude of the science and demonstrate the wisdom of the charge, particularly when it is not given in an isolated setting.

I am authorized to state that Judge Birdsong concurs in this special concurrence.

SHULMAN, Presiding Judge, dissenting.

Although I agree with the majority's conclusion that the complained of charge was error, I cannot agree that the error was harmless. It is my opinion that the trial court's instruction that "the law recognizes that medicine is an inexact science at best and that all a doctor may do is assist nature in accordance with the present state of medical experience," was harmful and mandates a reversal of the judgment of the trial court.

The charge, limiting the role of physician to a mere assistant to nature, practicing an inexact art, does not present an accurate representation of the current state of medicine or medical practice. It could be implied from the charge that a physician is not bound by a standard of ordinary care; he is only to be held tortiously accountable for acts of gross negligence. This unwarranted and impermissible broadening of the requisite standard of care renders the charge

reversible error.

Unlike the majority, I cannot find the erroneous charge harmless in the context of the entire charge. The complained of instruction expanded upon and, to an extent, contradicted the correct standard of care and, therefore, was misleading, confusing and prejudicial to the plaintiff.

The language in the instruction was taken verbatim from language in the case of *Hayes v. Brown,* 108 Ga. App. 360, 363 (133 SE2d 102). The fact that language is used in an appellate opinion does not render it necessarily appropriate as a jury instruction. See, e.g., *Bonita Theatre v. Bridges,* 31 Ga. App. 798 (2) (122 SE 255); *Chedel v. Mooney,* 158 Ga. 297 (11) (123 SE 300). In the case at bar it was not appropriate.

While the law recognizes that medicine is an "inexact" science, so must it also recognize that all disciplines are inexact to varying extents. It cannot be disputed, however, that there are "laws" of science and medicine that are invariable and exact. We have progressed to a point where medicine is not inexact "at best" but to where it is "at best" certain and exact.

Because of the body of knowledge in the field of medicine that is definitive, documented and clinically reliable, a physician is not limited to "assisting" nature but can, with the use of this knowledge and modern technology, manipulate nature. With this body of knowledge, a physician can alter, control, and even corrupt nature. To be certain, there are numerous aspects of medicine that remain speculative — that are yet to be understood and still to be explored — but experience and advancements in technology have rendered what was impossible a generation ago possible today.

A physician is not an insurer, and an unintended result does not raise an inference of negligence. On that point of law there is no dispute, and the jury was duly instructed to that effect. It is my opinion, however, that the trial court's instruction understated the present state of the practice or science of medicine; that it implied that physicians are to be held to a much lower standard of care than is mandated by law.

In the instant case, where plaintiff's allegations of negligence involved defendant's use of certain equipment and his failure to use other available means to aid his view of the operating site, a question of exactness was raised; that is, whether the defendant's failure to use available equipment, arguably more exact than that used, constituted a failure to exercise reasonable care. Therefore, it was inappropriate, expecially in this context, for the trial court to emphasize the inexact aspects of the science of medicine and the limitations of the physician vis-a-vis nature.

Again, I cannot agree with the majority's conclusion that charging the correct standard of care in conjunction with an instruction which inappropriately expanded upon that standard rendered the complained of charge harmless error. The giving of inconsistent and conflicting instructions is necessarily confusing to a jury. We cannot be certain that the jury properly rejected the inappropriate charge, which imposed a lesser standard of care, and applied the correct standard of care to determine whether the defendant-physician was negligent. It is therefore, in my opinion, unjust to find harmless the instruction which the majority deems erroneous.

The plaintiff should have the opportunity to retry her case under appropriate instructions to the jury that do not mislead or force consideration of an erroneous and strained standard of care. No erroneous charge can be deemed harmless which alters or lessens a litigant's chances of prevailing. It seems clear to me that that occurred in this case. That being so, I would reverse the judgment of the trial court and grant plaintiff's motion for a new trial.