62667. SULLIVAN et al. v. HENRY et al.

McMURRAY, Presiding Judge.
This is a medical malpractice case in which the plaintiffs, as the sole surviving issue of the decedent, seek damages for her wrongful

death brought against the defendants, a medical doctor and "John Doe(s), individually and/or agent(s) and/or employee(s) and/or official(s) of other defendants." The plaintiffs allege that the decedent died from acute kidney failure having been regularly treated "from November 24, 1977, to January 3, 1978," by the defendant medical doctor with any defendants John Doe(s) sanctioning, ratifying and/or participating, by their acts and/or omissions in the alleged negligent and/or grossly negligent treatment "for cancer with a course of therapy they knew or should have known to be inappropriate for the care or purpose and violative of any and all known and valid standards of care appropriate to the disease, cancer, thereby evidencing willful and wanton negligence and a total disregard for the results." Plaintiffs allege that the sole and proximate cause of the decedent's death arose out of the course of treatment which is in the experimental stage and is not and has not been sanctioned for use by the State of Georgia, seeking consequential or actual damages, including funeral expenses, for injuries, pain and suffering and wrongful death of the decedent, the mother of the plaintiffs, and for exemplary and punitive damages to deter or prevent the defendants from committing such wrongful acts in the future. The complaint was amended some three times and sought exemplary or punitive damages in a specific amount and a general prayer for a specific sum.

The defendant medical doctor answered, inter alia, denying the claim, admitting in substance only jurisdiction, the cause of decedent's death, the treatment of the decedent and the fact that he had advised her she had terminal cancer. He also admitted she was told that medical treatment and care under his instructions, guidance and control would be administered. He averred he was not negligent in any respect whatsoever and that he exercised a reasonable degree of care and skill at all times.

Motions to dismiss and to strike the complaint as amended on various grounds were also filed.

The defendant medical doctor, and subsequently the plaintiffs, moved for summary judgment, and both motions were later denied on procedural and other grounds. The defendant doctor then filed an additional summary judgment motion after discovery based upon the evidence having been presented, which included the defendant's treatment of the decedent for a number of years, including her hospital records and his own affidavit with reference to same. The affidavit of the defendant doctor discloses that as a medical expert he treated the decedent from May 22, 1975, until her death, for such things as hypertension, a heart problem, gallstones and a kidney problem. His treatment in July 1975 stressed the necessity for

gallbladder surgery, and the patient was referred to another doctor for surgery. Gallbladder surgery was performed in September 1975. Thereafter the affiant treated the patient for a throat problem and high blood pressure in February of 1976 and further complaints of nausea, vomiting and stomach pains. She returned again on June 20, 1977, complaining of abdominal pains and it was disclosed that her uterus was enlarged and she was again referred to the surgeon, and a hysterectomy was performed. (Note: From the hospital records, her final diagnosis after surgical removal of her uterus was that she was suffering with a mullerian tumor (Carcinosarcoma) with probable vascular invasion.) After her hospitalization the affiant continued to treat the patient for such things as hemorrhoids, a minor problem, a scabies rash and an upper respiratory infection. In early October of 1977 she began having further intestinal complaints, and he began treating her with valpin with phenobarbital as an intestinal relaxant and thorazine as a tranquilizer, later giving her empirin as a pain killer. Affiant consulted with her surgeon who indicated he had consulted with a radiotherapist and oncologist, "all of whom had informed him that there was no chemotherapy or radiotherapy available that would be useful in a case of [this patient's] type. On this basis [the patient] and her family members" were informed on November 24, 1977, "that there was no other advisable treatment," that she did have a malignancy, that it was a terminal type thing and that he had no help to offer her except pain medication. He fully explained to her about the prospects of treating her condition with laetrile or vitamin B-17 and, "gave her and her family a copy of instructions regarding this type of treatment." The patient indicated that she desired to be treated by the use of nutritional therapy and laetrile, and affiant proceeded to administer intravenously amygdalin or vitamin B-17. She was also given vitamins and eating instructions. He offered to act as her agent to get the laetrile, and the patient and her family would pay only for the medicine and not for the administering of the medicine. On November 28, 1977, affiant saw the patient when she came in primarily for treatment and her complaints were the same as they were previously. He next saw her on November 30, 1977, when she came to his office for the injection. On December 2, 1977, he gave her an injection of amygdalin. Again on December 5 and 7, 1977, he saw her for the purpose of the injection and "she thought she was improving." Her injections of laetrile were continued on December 9, 12 and December 14, 1977, and also on December 14, 1977 a vaginal examination revealed to him "less fixation of the left mass than before." On December 19, 1977, she returned "feeling bad," and the affiant noticed that the tumor was beginning to enlarge. She continued the injections on December 23

and 27, 1977. On December 31, 1977, she indicated she had difficulty passing urine and was sick, and on that occasion affiant did not give her an injection. At that time he felt that she was "headed toward kidney failure," and did not see her again until the time of her death on January 3, 1978. The affiant, after listing his treatment, expressed the opinion as a medical expert that he had exercised a reasonable degree of care and skill and had exercised that degree of care and skill "employed by the medical profession generally under similar conditions and like surrounding circumstances"; that she was "a terminally ill cancer patient at the time of and prior to the time that [he] undertook to procure and administer Laetrile to her"; that prior to administering laetrile to her he "declared her to be terminally ill in affidavit form, all in accordance with the requirements and guide lines set forth . . . in the *Rutherford* decision" (apparently reference is to one of the Rutherford v. United States of America opinions seeking injunctive relief against the Federal Drug Administration to prevent it from interfering with cancer victims, as a class, in the exercise of freedom of choice in obtaining and using vitamin B-17, laetrile or amygdalin which was not being allowed to be transported in interstate commerce. These decisions are found in 399 FSupp. 1208; 542 F2d 1137; 424 FSupp. 105; 429 FSupp. 506, 508-510; 438 FSupp. 1287, 1294-1298 and 582 F2d 1234, cert. granted to United States of America (Am. Cancer Society motion to intervene) 439 U. S. 1127 (99 SC 1042, 59 LE2d 87), cert. denied to Rutherford, 439 U. S. 1128 (99 SC 1045, 59 LE2d 89). See also Keene v. United States of America, 81 FRD 653). He then expressed the opinion that "based upon a reasonable degree of medical certainty" his treatment was neither the primary, nor a contributing cause of her death. His further opinion was that his examination of the various hospital records with reference to the decedent were entirely consistent with the fact that at all times in treating the decedent he "exercised a reasonable degree of care and skill" and "that degree of care and skill employed by the medical profession generally under similar conditions and like surrounding circumstances." The certified copy of the hospital records were attached to the affidavit as well as a certified copy of the affiant's personal office medical records relative to his treatment of the patient. Another medical doctor, by affidavit deposed, after giving his medical expert qualifications and as a qualified toxicologist, that he examined the death certificate, the defendant doctor's office records and treatment and defendant doctor's affidavit and gave his opinion that "the dosages of Amygdalin . . . did not cause or in any way contribute to the cause of death of [the decedent]."

The death certificate disclosed that the immediate cause of her

death was acute kidney failure due to metastatic carcinosarcoma of the uterus. This, in turn, was signed by the defendant doctor as decedent's attending physician. Also attached to the defendant doctor's affidavit was a nutritional therapy diet recommended with the use of laetrile (vitamin B-17). This diet and treatment schedule, in addition to the nutritional therapy set out that vitamin B-17 was illegal in the treatment of cancer, but legal for use as a non-specific nutritional supplement, listing also where the vitamin B-17 could be obtained such as amygdalin, including treatment with pangamic acid (vitamin B-15) and wobenzyme.

In support of plaintiffs' motion for summary judgment (which was denied) and in opposition to defendant's motion for summary judgment, as well as considered with reference to defendant's second motion for summary judgment, was the affidavit, submitted by plaintiffs, of another medical expert in internal medicine, nutrition, hematology and oncology, and offered as a specialist in the field of internal medicine, hematology, oncology and nutrition. This affiant deposed that he had carefully and thoroughly reviewed the medical records of the decedent and stated that as a practicing medical doctor and specialist he knew of his own knowledge "that the drugs, Laetrile (Amygdalin), pangamic acid (Vitamin B-15), Wobenzyme, and Amygdalin (Laetrile, Vitamin B-17), are drugs which are not approved for use by the United States Food and Drug Administration relating to human drugs." Affiant also deposed that it was within his personal knowledge "that the last set out named drugs are illegal for the purpose of interstate commerce since . . . the four named drugs are unapproved . . . for human treatment" in 1980 at the time of the affidavit, nor during the calendar years 1977 and 1978. The affiant then set forth that from an in-depth study of the medical records of the decedent it was his medical opinion "that the administering of the four drugs hereinbefore set out by defendant, and other negligent medical care rendered as set out in the medical records of the [decedent], by the said [defendant] were the sole, contributing factors leading up to and the ultimate cause of the death" of the decedent. He then further stated that the giving of these illegal drugs and other negligent medical care rendered to her were the "primary contributing factors to the death" of the decedent. An affidavit of the deputy director, Bureau of Drugs, United States Food and Drug Administration, was in evidence deposing that amygdalin (laetrile, vitamin B-17) intended for the treatment, alleviation or cure of cancer or any other ailment in humans is a new drug and an unapproved drug prohibited from use except "solely for investigational use by experts qualified by scientific training and experience to investigate the safety and effectiveness of drugs," and

that from his search of the official records "as of this date there is not on file an acceptable IND [investigational new drug application] identifying [the defendant] permitting its [laetrile, vitamin B-17] investigational use."

Included also in the record is a copy of the decision in Rutherford v. United States of America, 429 FSupp. 506, 509, supra, containing the order and decree and memorandum opinion, wherein the class action suit was held to encompass "all 'terminally ill cancer patients'. . . declared by a practicing physician (M. D.) to be terminally ill," by providing certain information to be included in a prescribed form of affidavit.

Further, in opposition to the defendant doctor's motion for summary judgment is a deposition for trial use as to plaintiffs' medical expert who had deposed above which was taken with reference to his personal knowledge in the practice of medicine of cases in which laetrile or amygdalin was used expressing the opinion that it was illegal to use it and that it was worthless and "a poison with no beneficial effects known." This deposition was filed June 9, 1980, and opened on "3/24/81," the order here on appeal having been filed April 1, 1981. On May 11, 1981, the trial court ordered that in consideration of the defendant doctor's motion for summary judgment same was granted *after considering relevant portions of all the depositions.* The transcript of the hearing was also ordered included in the record on appeal. Plaintiffs' medical expert by deposition testified that laetrile is a plant chemical containing cyanide, six percent by weight (one gram of oral laetrile containing "60 milligrams of cyanide"), and that in taking laetrile orally along with certain plant enzymes eaten with it (a vegetarian diet) the cyanide is released by the plant enzymes causing "cyanide poisoning." Deponent testified that "what you get from oral Laetrile is cyanide poisoning in proportion to how much of your diet with it is a vegetarian diet, and what you get from injected Laetrile is infection with bacteria and fungus released cyanide from the deteriorated Laetrile in insect parts." He testified further that he had never administered laetrile to a patient "as it could be lethal," that there is no safe dosage of laetrile. He was then asked a hypothetical question with reference to a patient "approximately four months prior to her death having been diagnosed as having carcino sarcoma of the uterus with metastatis, hypertension and generalized arteriosclerosis, and who had frequent problems with not being able to urinate or have bowel movements, was 55 years of age; would you, sir, administer Laetrile or Amygdalin to that patient?" He replied, "Never, it could be lethal." He then testified that the taking of laetrile results in the release of three nerve poisonings, "the cyanide itself and the two

so-called detoxification by-products, thiocyanate and cyanate." He also testified he examined the depositions in the case sub judice including the hospital records of the decedent and found no evidence of any chest X-rays having been taken and that in order to diagnose metastasis of cancer it would be necessary to have chest X-rays; no statement from an attending surgeon regarding local metastasis, whether the entire malignancy had been removed, and no post-operative radiotherapy was ordered "which would be a special treatment, local post-operative radiation, if there was local mastastasis after removal of the tumor." He then expressed the opinion that the defendant doctor's notes suggest "he felt impacted feces and called it cancer and diagnosed metastatic cancer from feeling impacted feces on vaginal examination," and found that he did not do what he should have done, that is, refer the patient back to the surgeon or to a gynecologist to do an examination to determine whether there was a local metastasis, local spread, that is, if he felt that one of these lumps he felt was cancer. He further testified that as a reasonable standard of care a general practitioner is not competent to treat a patient for cancer, that is, not competent to treat a cancer which has not been diagnosed as a cancer and that in his opinion the defendant doctor diagnosed terminal metastatic cancer without taking the necessary diagnostic steps, the same being negligence per se under Georgia law. He also testified that the drugs amygdalin, laetrile, B-17, B-15 and pangamic acid are not listed in the Physician's Desk Reference, a standard reference of pharmaceuticals which physicians are allowed to use in the United States. In summary he testified that he had reviewed the depositions, the record here; and in his expert opinion as to the treatment of the decedent it is not clear that there was adequate information to make a diagnosis of metastatic cancer either locally metastatic in the pelvis or distally metastatic to the lungs, and if there was metastatic cancer same was local in the pelvis for which the treatment is radiotherapy; and in no event should the patient have been given the poison she was given; and particularly she should not have gotten laetrile "because all it could possibly give her is cyanide poisoning and drop her blood pressure." He further testified that the defendant doctor's notes show she had a kidney problem and in his (deponent's) opinion he (the defendant doctor) was negligent in failing to investigate to find what the nature of the kidney problem was.

The substance of this medical expert's testimony by deposition and by affidavit is that from the records he examined with reference to this patient (the decedent) the medical doctor (the defendant) treating her had not properly diagnosed her condition as being terminal cancer in that there was no metastasis and in thereafter

giving her laetrile, a poison, without investigational drug application. He then expressed a medical opinion that her death was not from cancer, but was from either blockage of her drainage tubes from both kidneys due to impacted feces or due to cyanide poisoning from laetrile or from an undiagnosed kidney disease or from hypertension induced by three simultaneously given agents that dropped the blood pressure, or all of the above.

In ruling on the motion, the trial court held that in consideration of the plaintiffs' medical expert testimony which referred to the medical records of the decedent and relied upon by the affiant in forming his opinion did not have attached either sworn or certified copies of the medical records therein relied upon; therefore, his evidence would be inadmissible on the trial of the case and also would be inadmissible on the motion for summary judgment, citing *Thomasson v. Trust Company Bank,* 149 Ga. App. 556, 557 (254 SE2d 881); *Matthews v. Wilson,* 119 Ga. App. 708 (168 SE2d 864). The trial court held that at the trial of the case, in order for this affiant's opinion as to the negligence of the defendant doctor to be admissible "the basis on which that opinion was formed would have to be established. The Plaintiff[s] could accomplish this by posing a hypothetical question to [the medical expert] based on facts in evidence or by asking him to state an opinion based on his personal observations.

"Likewise, an affidavit containing opinion evidence, to be of probative value in opposition to a Motion for Summary Judgment, would have to lay a foundation for the opinion given. Where the affidavit does not and cannot recite that the facts relied upon are based on the personal knowledge of the affiant but relies on a review of medical records, certified or sworn copies of those records must be attached or filed therewith for the opinion to have any factual basis at all," citing *Green v. Wright,* 225 Ga. 25 (165 SE2d 843), and *Hembree v. Cotton States Mut. Ins. Co.,* 132 Ga. App. 556, 557 (208 SE2d 568). Consequently, the court could not consider the opinion evidence in the opposing medical expert's affidavit. Therefore, based upon *Howard v. Walker,* 242 Ga. 406 (249 SE2d 45); *Parker v. Knight,* 245 Ga. 782 (267 SE2d 222); *Payne v. Golden,* 245 Ga. 784 (267 SE2d 211); and *Skinner v. Coleman-Nincic Urology Clinic,* 156 Ga. App. 638 (275 SE2d 724), defendant's motion for summary judgment was granted. However, as noted above, the order was amended to show the trial court did consider relevant portions of the depositions as well. Plaintiffs appeal. *Held:*

1. This case is very similar to the recent Atlanta case of Scott v. McDonald (in the Northern District of Georgia) in which the gravamen of the complaint was that the defendant negligently

treated plaintiff's decedent with a course of therapy (laetrile, vitamin B-17) which he knew, or should have known, to be inappropriate for the purpose and violative of any known or valid standard of care. See in this connection Scott v. McDonald, 70 FRD 568. We do not believe the trial of the Scott v. McDonald case was reported by the United States District Court, Northern District of Georgia. However, the case sub judice differs from the McDonald case in that both the plaintiffs and the defendant Henry, M. D., in the pleadings in this case admit the patient died from acute kidney failure. The death certificate as signed by the defendant doctor stated the acute kidney failure was due to metastatic carcinosarcoma of the uterus. Plaintiffs in the case sub judice contest the diagnosis of terminal cancer in that approximately six months before her death the decedent had a hysterectomy and contend the defendant doctor had misdiagnosed her physical condition, that the cancer (removed by hysterectomy) had metastasized, hence the defendant doctor was negligent in assuming the cancer had returned (without further proof) and in thereafter treating her by the use of nutritional therapy and laetrile, the laetrile being a poison which when given with a certain diet would release cyanide causing "cyanide poisoning," hence the plaintiffs' decedent suffering from hypertension, heart trouble and an undiagnosed kidney disease, when given this poison would create the kidney failure. However, unlike the McDonald case, the case sub judice is before this court upon the grant of summary judgment in favor of the defendant doctor based upon his own opinion as a medical expert expressed by affidavit that he had "exercised a reasonable degree of care and skill" and such degree of care and skill was that "employed by the medical profession generally under similar conditions and like surrounding circumstances," and in disregarding the opposing medical expert's affidavit as having no probative value since it was not based on personal knowledge, but relied on the review of medical records which were not sworn nor certified and attached to the affidavit (attached or filed with the affidavit in order for the opinion to have any factual basis.) The trial court in its order cited the controlling case law found in *Howard v. Walker,* 242 Ga. 406, supra; *Parker v. Knight,* 245 Ga. 782, supra; *Payne v. Golden,* 245 Ga. 784, supra. The final order involved in this appeal was signed on April 1, 1981. Certain depositions were filed and opened both before and after that order. A deposition of plaintiffs' medical expert, whose affidavit was referred to in the final order, was filed on June 9, 1980, and was opened on "3/24/81," as shown by the record here. In an order dated May 7, 1981, and filed on May 8, 1981, the trial court ordered three depositions on file be opened "for the specific purpose of including said three depositions . . . on appeal."

That court in an order of May 11, 1981, filed on May 12, 1981, required certain additional matter be included in the record, and by further order amended an earlier order allowing certain depositions opened for inclusion in the record on appeal stating therein that the motion for summary judgment of the defendant "was granted after a complete and thorough review of the record in this case, including relevant portions of the depositions." Accordingly, we must consider the entire record before the court even though the final order dated April 1, 1981, referred only to the defendant's affidavit as a medical expert and disregarded the affidavit of the plaintiffs' medical expert in reaching the decision granting the motion for summary judgment.

The basis for all medical malpractice cases in this state is Code § 84-924 which requires that in "the administering of medicine for compensation" by any person he "must bring to the exercise of his profession a reasonable degree of care and skill. Any injury resulting from any want of such care and skill shall be a tort for which a recovery may be had." The law presumes that a physician exercises his skill in the medical and surgical field in an ordinarily skillful manner, and the burden is on one who denies it to show lack of due care, skill and diligence. *Shea v. Phillips,* 213 Ga. 269, 271 (2) (98 SE2d 552); *Slack v. Moorhead,* 152 Ga. App. 68, 71 (262 SE2d 186). Further, the degree of care and skill ordinarily employed by the medical profession is that degree of care and skill ordinarily employed by the profession *generally* and not *locally.* See *Fain v. Moore,* 155 Ga. App. 209 (270 SE2d 375); *Slack v. Moorhead,* 152 Ga. App. 68, 71, supra. The law recognizes that medicine is an inexact science at best and all a doctor may do is to assist nature in accordance with the present state of medical experience. Hence, the fact that the treatment has resulted unfavorably does not raise even a presumption of want of proper care, skill or diligence. See *Branch v. Anderson,* 47 Ga. App. 858, 860 (171 SE 771); *Howell v. Jackson,* 65 Ga. App. 422, 423 (1) (16 SE2d 45); *Hayes v. Brown,* 108 Ga. App. 360, 363 (1) (133 SE2d 102).

However, in the recent whole court case of *Blount v. Moore,* 159 Ga. App. 80, 81-82 (1) (282 SE2d 720), the above language recognizing that medicine is an inexact science which was given in a charge to the jury was criticized as being argumentative, inappropriate and misleading and not adaptable as a jury instruction despite the fact that it is a correct statement of the law as "a gratuitous preface to the rule that no inference of malpractice may be drawn from unfavorable treatment," that is, that a doctor is judged by conduct and not result, and that fact alone "does not render it appropriate as a jury instruction on that principle." This court then cited at page 82 the

fact that language which would be proper in a headnote or in an opinion by a reviewing court may be improper when embodied in a charge to a jury, and the fact that the excerpt was taken verbatim from a decision of this court does not make the giving of it proper. *Bonita Theatre v. Bridges,* 31 Ga. App. 798, 805-806 (122 SE 255). See also *Chedel v. Mooney,* 158 Ga. 297, 300 (11) (123 SE 300). Here, of course, we are reviewing the grant of a motion for summary judgment and not a case involving a complete trial.

In the case sub judice the defendant doctor contends he made no charge for his services, yet there is evidence in the record showing charges for office visits and other payments, and the deposition of one of the plaintiffs is that the defendant had been given the sum of $750 presumably for the payment of medicine. We do not believe the evidence here demands a finding that the treatment here involved was not for compensation, nor is this necessarily controlling.

2. The defendant doctor has admitted that he treated the patient (decedent) by the use of drugs (laetrile, vitamin B-17), amygdalin, together with pangamic acid and wobenzyme. It is quite evident that in the medical profession the use of such drugs involves considerable controversy, particularly since the Bureau of Drugs, U. S. Food and Drug Administration, has classified amygdalin (laetrile vitamin B-17) "solely for investigational use by experts qualified by scientific training and experience to investigate the safety and effectiveness of drugs." At the time of its use by the defendant doctor he had not qualified as an expert in the investigational use of laetrile, vitamin B-17. Consequently, in consideration of the entire record here, regardless of the humanitarian nature of the treatment by the defendant doctor, the plaintiffs have produced expert testimony which creates issues of material fact. With reference to the defendant doctor's diagnosis of cancer this defendant determined the patient (decedent) was suffering from a malignancy without further study as to type. The opposing medical expert expressed the opinion that a general practitioner is not competent to treat a patient for cancer, not competent to treat a cancer which has not been diagnosed as a cancer, did not take the necessary diagnostic steps and admittedly treated the patient with the drugs amygdalin, laetrile, vitamin B-17, vitamin B-15 and pangamic acid, all of which are not listed in the Physician's Desk Reference of standard pharmaceuticals which physicians are allowed to use in the United States. The patient had been given poison, which upon entrance to the body would release three nerve poisonings "the cyanide itself and the two so-called detoxification by-products thiocyanate and cyanate," and to a patient suffering from kidney disease, hypertension and a heart problem this could very well have caused the death of the decedent from kidney failure.

Upon our consideration of the entire record before us, we find that a jury issue remains as to which of the medical experts to believe in view of the conflicting expert testimony. The summary judgment here was improperly granted as the opposing party has produced rebuttal evidence as required by *Parker v. Knight,* 245 Ga. 782 (2), supra. See also *Shea v. Phillips,* 213 Ga. 269, 271 (2), supra; *Benefield v. Malone,* 110 Ga. App. 607, 610-611 (139 SE2d 500); *Watkins v. Nationwide Mut. Fire Ins. Co.,* 113 Ga. App. 801, 802 (149 SE2d 749).

*Judgment reversed. Quillian, C. J., and Pope, J., concur.*

DECIDED JANUARY 5, 1982.

*Harold E. Martin,* for appellants.
*E. Bruce Benton, Wallace Miller III,* for appellees.