63659, 63660. EMORY UNIVERSITY et al. v. PADGETT;
and vice versa.

POPE, Judge.

Catherine C. Padgett (hereinafter plaintiff) brought this action against Emory University; P. N. Symbas, M. D.; William R. Higgs, M. D.; and Fulton-DeKalb Hospital Authority (hereinafter defendants) seeking damages for medical malpractice arising out of a surgical procedure performed upon her at Grady Memorial Hospital on December 18, 1975. This action was originally brought in DeKalb County on February 16, 1979. The DeKalb County suit was voluntarily dismissed without prejudice, and suit was filed within six months in Fulton County. See Code Ann. § 3-808. Following plaintiff's deposition, defendants moved for summary judgment on the ground that plaintiff had not been disabled so as to toll the

two-year statute of limitation provided in Code Ann. § 3-1102. See Code Ann. § 3-801. Plaintiff responded to defendants' motion and also moved to strike their statute of limitation defense. The trial court denied both motions, and this court granted an interlocutory appeal therefrom.

The issues in this case both involve the evidence of record as to plaintiff's mental incapacity between the time of the subject surgical procedure and the institution of this lawsuit. Defendants contend on main appeal that the evidence of record conclusively shows that plaintiff was not mentally incompetent as alleged. Plaintiff contends on cross appeal that the evidence conclusively shows that she was indeed mentally incompetent. Our view of the record in this case compels the conclusion that an issue of fact remains with regard to plaintiff's mental incapacity during the alleged period of disability, and we affirm the judgment of the trial court.

In support of their motion for summary judgment defendants rely solely on testimony given by plaintiff in her deposition. They cite the following chronology of events, gleaned from plaintiff's deposition, as significant in piercing her allegation of mental incapacity: On December 18, 1975 plaintiff underwent thoracic surgery at Grady Memorial Hospital, which gives rise to this action. During the first week in January 1976 plaintiff was discharged from Grady and stayed with a friend (Mrs. Hopkins) until returning to Grady for an unrelated laparotomy. She also went to Grady to get Dr. Higgs to sign a paper stating that it was in her best interest to stay with Mrs. Hopkins. In early January 1976 plaintiff executed a deed to her mother conveying her interest in a house she owned in order to become eligible for Social Security benefits and because she was unable to make the house payments. On February 6, 1976 plaintiff underwent the laparotomy at Grady. In March 1976 she started radiation treatments at Grady and returned to Grady for periodic appointments on a more or less regular basis for several months. In July 1976 plaintiff left Mrs. Hopkins and moved in with friends on Park Circle in Atlanta, where she stayed until February 1977.

In February 1977 plaintiff moved to an apartment on Peachtree Road in Atlanta and lived alone. She put down a deposit and may have signed a lease. She purchased groceries at a store across the street from the apartment. In August 1977 she traveled with her brother by car to New Hampshire to visit friends for a month. In September 1977 she arranged for and purchased an airplane ticket and flew alone to Albuquerque, New Mexico. She rented an apartment in Albuquerque. While there she sought medical attention and decided not to have an operation recommended by her attending physician. On December 6, 1977 she again arranged for and

purchased an airplane ticket, traveling from Albuquerque to Boston, Massachusetts. She used a Social Security check to purchase the airplane ticket. On December 21, 1977 she traveled from New Hampshire to Vermont by car to consult a spiritual advisor. She visited an ashram, or monastery, in Worcester, Vermont and spent Christmas of 1977 at the ashram. In January 1978 plaintiff and her brother rented a trailer on a farm near Plainfield, Vermont, where she stayed until May 1978.

During this entire period of time, plaintiff received, endorsed and cashed her Social Security checks. She also opened a small savings account at the National Bank of Georgia to assist in cashing these checks. She paid bills for rent, groceries and clothes with cash. She reported her change of address to the Social Security Administration every time she moved in order to insure timely receipt of the monthly benefit checks. She also reported to Social Security each time she started living with someone in order to get correct benefits. Finally, plaintiff kept in touch with her mother in Atlanta on a fairly regular basis.

In response to defendants' motion for summary judgment and in support of her motion to strike, plaintiff relies primarily on affidavits submitted by herself, her mother, her brother, her mother's housekeeper and a psychiatrist. She cites the following chronology of events, gleaned from her deposition and the foregoing affidavits, as conclusively establishing her mental incapacity: As a result of the radical thoracic surgery performed on December 18, 1975, plaintiff was under the "total care" of others. Half of plaintiff's chest cavity, including numerous ribs, her sternum and most of one lung, were removed. She was in tremendous pain and was given large doses of hallucinogens, including morphine and Demerol (pethidine), which caused mental instability and hallucinations. Plaintiff was in the hospital until January 12, 1976 and was then readmitted on February 10 until March 6. Throughout this time she was under the total care, first of her mother and housekeeper, then of two friends. They fed her, bathed her, and took her to and from her hospital appointments.

Plaintiff's mother took over the management of plaintiff's personal and business affairs, filing for Social Security Supplemental Income Benefits (SSI) on her behalf and keeping up with and eventually selling plaintiff's house. Plaintiff was continuously bedridden, seriously depressed, suicidal, in intense pain, and heavily drugged from March 1976 through January 1977. While she was still in the hospital, plaintiff began radiation therapy. That therapy caused her to vomit for hours at the slightest stimulus. She could see no one, could not eat, and was eventually fed intravenously. The drugs continued as did the hallucinations. She

eventually developed a physical addiction to Demerol. She suffered internal and external radiation burns and was readmitted to the hospital.

In July 1976, frustrated by her condition and dependency, plaintiff left her family and moved in with friends in Atlanta who continued the care her mother and the housekeeper had been providing. In August 1976 the SSI checks began arriving, but plaintiff was unable to negotiate them. The same friends who fed her and cooked for her and took her to chemotherapy sessions also negotiated the checks for her, using the money for her care and support. Plaintiff began chemotherapy in July 1976. In addition to severe nausea, weakness and difficulty eating, plaintiff began to lose the feeling in her legs and ankles as a result of the chemotherapy. She was confined to bed or a wheelchair and suffered terrible mental anguish. An accident in December 1976, coupled with the numbness and nausea and fear of chemotherapy, triggered serious depression and a sense of hopelessness.

Despite her physical inability to care for herself in even the simplest ways — shopping, cooking, cleaning, going to see the doctor — and her emotional debilitation and depression, plaintiff wanted her own apartment. In February 1977 she moved to an apartment on Peachtree Road. Now the housekeeper came there to cook and clean, and her friends came by often to check on her. However, in March 1977 plaintiff caught shingles at Grady and became immobilized. She was given mood-elevating drugs that made her feel groggy and helpless all the time. In May she was readmitted for a lymphangiogram that caused bleeding in her lungs. In late May plaintiff had her first death premonition, which convinced her that she had only a short time to live.

Badly shaken by the death premonition, plaintiff was sure that her life was almost over and in August 1977 got her brother to drive her to an ashram (meditation center) in New Hampshire, where she spent her time resting in bed and meditating. While there, she had a second premonition that totally devastated her. She had her brother drive her back to Atlanta, where she sold or gave away everything she owned. In September 1977 plaintiff went from Atlanta to a meditation center in Albuquerque, New Mexico where others, including a nurse, saw how ill she was and took over her care and maintenance. Emotionally incapable of coping with her fear of doctors, plaintiff stopped taking the medications and suffered severe pain, as well as auditory and visual hallucinations.

Plaintiff stayed in Albuquerque until December 1977 when she again sought the help of old friends, this time in New Hampshire. By this time she was heavily involved in spiritual meditation. She spent

six hours a day in prayer in Albuquerque and continued that practice in Vermont with her brother beginning in January 1978. The psychiatrist describes this period of time as characterized by severe depression, low level functioning, and an inability to decide rationally what was best for herself. Plaintiff and her brother lived a remote, "Thoreau-like" macrobiotic existence in a trailer in Vermont. She was dependent on her brother for help "with all the daily functions of her life." This inability to function on her own created tremendous anxiety and mental frustration, which were compounded by her physical limitations.

Afraid of the coming winter and renewed bone pain that the cold weather would bring, plaintiff went south in August 1978 to St. Petersburg, Florida, where she had gone to school, and contacted a friend from college who helped care for her. Nevertheless, she continued to lose weight and have difficulty breathing. By November plaintiff's condition had deteriorated. She called her mother, who arranged to have a ticket waiting at the airport for her to fly home. Her mother picked her up, located a specialist who accepted Medicaid, and took her to the specialist's office. Plaintiff was put in the hospital. Her mother then contacted an attorney on plaintiff's behalf, and this action was filed shortly thereafter.

The issues in this case are controlled by the recent decision of this court in *Tri-Cities Hosp. Auth. v. Sheats,* 156 Ga. App. 28 (273 SE2d 903) (1980), affd. 247 Ga. 713 (279 SE2d 210) (1981). An accurate characterization of the evidence of record with regard to plaintiff's mental incapacity is that there is a conflict between her deposition which would demand a finding that, based upon her conduct, she was not mentally incapacitated, and the affidavits which aver that she was without sufficient mental capacity to perform or understand her conduct during the relevant period. Whether plaintiff's deposition testimony is entitled to be given more weight than the subject affidavits is not a question which can be answered on summary judgment. *Tri-Cities Hosp. Auth. v. Sheats,* supra. Nor does it appear beyond a reasonable doubt that defendants will be unable to succeed in their statute of limitation defense by any set of facts which could be proved in support thereof. *West v. Griggs,* 144 Ga. App. 285 (1) (241 SE2d 26) (1977); see *Rhyne v. Garfield,* 236 Ga. 694 (225 SE2d 43) (1976). Since the issue of plaintiff's mental incapacity can not be resolved as a matter of law, the trial court properly preserved the issue for trial, where the burden of proof will be upon plaintiff to prove her mental incapacity and its continuance for such time as to toll the statute of limitation. Accord, *Arnold v. Limeburger,* 122 Ga. 72 (10, 11) (49 SE 812) (1904).

*Judgment affirmed. McMurray, P. J., Shulman, P. J., Banke,*

*Birdsong and Sognier, JJ., concur. Quillian, C. J., Deen, P. J., and Carley, J., dissent.*

DECIDED JULY 15, 1982 —
REHEARING DENIED JULY 30, 1982 IN CASE NO. 63659 —

*Earle B. May, Jr., Jack Spalding Schroder, Jr.,* for appellants.
*Kathleen L. Wilde, John F. Sweet,* for appellee.

DEEN, Presiding Judge, dissenting.

The Supreme Court in *Tri-Cities Hosp. Auth. v. Sheats,* 247 Ga. 713 (279 SE2d 210) (1981), while outlining in that case the condition of the patient "that he had been in a coma from early September to October of 1974; that he was unable to walk or talk after regaining consciousness though these functions eventually returned; that he remained 'foggy' for a period of time, was unable to get a job and relied on his brother for housing and support. He testified that until March of 1977 he essentially 'laid around the house,' " held that these admitted facts as to his actual condition were not materially in contradiction to his conclusory affidavit "that he was totally incapable of transacting business for himself," therefore, the rule in *Chambers v. C. & S. Nat. Bank,* 242 Ga. 498 (249 SE2d 214) (1978) was inapplicable. A jury question was present in that case as to mental incapacitation.

Here, the patient signed a similar type general conclusory affidavit that she was mentally and physically incapacitated which prohibited the conducting of her ordinary affairs of life. This is materially contradicted by her deposition in which she discloses such variety of activities outside of her confinement, such as renting apartments, living alone for extended periods of time, buying groceries and paying bills in cash, arranging for and purchasing several airline tickets, traveling alone to various parts of the country by plane and with others by automobile, telephoning her mother on a regular basis, keeping in touch with friends by telephone and letters, seeking new ways of healing by rest, meditation, prayer, natural foods and vitamins while reconsidering the use of and rejecting orthodox drugs, radiation and psychiatric treatment and previously accepted medical advice, and reporting a change of address to the Social Security Administration each time she moved in order to insure receipt of monthly benefit checks. Whether applying *Chambers,* supra, or the rule in *Burnette Ford, Inc. v. Hayes,* 227 Ga. 551 (181 SE2d 866) (1971), the evidence on deposition and affidavits on file

demand that although the patient endured grave physical and mental pain, suffering and anguish and was helped, aided and advised by many friends and relatives with her problems, nevertheless, she made many decisions demonstrating beyond question that she could conduct the ordinary affairs of life. The fact that her choices and selections of treatment differed from the views of her own professional psychiatrist and medical doctor does not render her mentally incapable.

This case points out two different methods of medical healing. Phase one of the time period is a picture of plaintiff being provided with large doses of hallucinogens, morphine, Demerol, drug medication, radiation therapy, chemotherapy, mood elevating drugs and other orthodox treatment. This caused her to vomit for hours, bleeding, could not eat, legs became numb and she suffered terrible mental and physical pain. This time period was a little over a year. *Blount v. Moore*, 159 Ga. App. 80, 86 (282 SE2d 720) (1981). The second phase was a decision and the choice of the plaintiff to totally reject all previously accepted medical treatment. This time period of approximately over a year consisted of rest in bed, long periods of meditation at an ashram, hours at a time of prayer, living in quiet and rest — as her psychiatrist stated, in a "Thoreau-like" remote lifestyle, adoption of a natural food menu of herbs, vegetables and Vitamin B and other natural foods, a growing distrust of previous chemotherapy and radiation, a total fear of all her doctors, embracing only natural healing methods. Plaintiff's psychiatrist testified that the plaintiff's judgment as to this new healing preventative methodology was poor judgment on her part and that she did not avail herself of more appropriate treatment. He testified: "It was apparent to me that Catherine could maintain only a very low level of functioning. She had a limited capacity to organize herself and manage her life." The fact that the plaintiff rejected the advice of her doctors and psychiatrist does not render plaintiff unable to handle the ordinary affairs of her life.

I would reverse, as the trial court should have granted defendant's motion for summary judgment since plaintiff was not mentally incapacitated and since the statute of limitation had run; therefore, I respectfully dissent.

I am authorized to state that Chief Judge Quillian and Judge Carley concur in this dissent.