40069. HAYES v. BROWN.

DECIDED SEPTEMBER 4, 1963—REHEARING DENIED
SEPTEMBER 23, 1963.

*Grubbs & Prosser, J. M. Grubbs, Jr., Holcomb & McDuff, Frank D. Holcomb,* for plaintiff in error.

*Hansell, Post, Brandon & Dorsey, Hugh E. Wright,* contra.

BELL, Judge. On review of a summary judgment the first essential question for determination by the appellate court is whether a genuine issue of material fact exists which should be decided by a jury. If no jury issue is found to exist, the next query is whether the moving party is entitled to judgment as a matter of law after each party had an opportunity to make out his case. *Code Ann.*

§ 110-1203. *Holland v. Sanfax Corp.*, 106 Ga. App. 1, 4 (1) (126 SE2d 442).

1. The basis for a malpractice action is provided in *Code* § 84-924 which provides: "A person professing to practice surgery or the administering of medicine for compensation must bring to the exercise of his profession a reasonable degree of care and skill. Any injury resulting from a want of such care and skill shall be a tort for which a recovery may be had." The degree of care and skill required is that which, under similar conditions and like surrounding circumstances is ordinarily employed by the profession generally. *Akridge v. Noble*, 114 Ga. 949, 958 (41 SE 78); *Fincher v. Davis*, 27 Ga. App. 494 (5) (108 SE 905); *Chapman v. Radcliffe*, 44 Ga. App. 649 (162 SE 651). The court and jury must have a standard measure which they are to use in measuring the acts of a doctor to determine whether he exercised a reasonable degree of care and skill; they are not permitted to set up and use any arbitrary or artificial standard of measurement that the jury may wish to apply. The proper standard of measurement is to be established by testimony of physicians, for it is a medical question. *Pilgrim v. Landham*, 63 Ga. App. 451 (4) (11 SE2d 420); *Howell v. Jackson*, 65 Ga. App. 422 (16 SE2d 45).

A doctor is not an insurer and an unintended result does not raise even an inference of negligence. "A physician can not always effect a cure." *Howell v. Jackson*, 65 Ga. App. 422, 423, supra. The law recognizes that medicine is an inexact science at best and all a doctor may do is to assist nature in accordance with the present state of medical experience. "The fact that treatment has resulted unfavorably does not raise even a presumption of want of proper care, skill, or diligence." *Branch v. Anderson*, 47 Ga. App. 858, 860 (171 SE 771); Wall v. Brim, 138 F2d 478 (5th Cir.), applying Georgia law. It is also well established in this jurisdiction that "the presumption is that the medical or surgical services were performed in an ordinarily skillful manner." *Shea v. Phillips*, 213 Ga. 269 (2) (98 SE2d 552).

2. After reviewing the evidence, we find that the only foundation for Hayes' first allegation that Dr. Brown cut the audi-

tory nerve in his right ear is plaintiff's own unsupported supposition that he did not develop nerve deafness until after the operation. Plaintiff's own medical witness, Dr. Alper, flatly refutes this contention.

The medical evidence shows that Hayes' hearing problem was mixed, involving both air conduction and bone conduction or nerve deafness, *in both ears prior to the operation,* though to a different extent in each ear. The tests made under Dr. Brown's supervision indicated that the nerve or bone conduction loss in Hayes' right ear was the same before and soon after the operation on that ear, but he found that the air conduction loss had increased. The audiogram made by Dr. Brown some three months after the operation showed that the air conduction loss in plaintiff's right ear was 90 percent and the bone or nerve conduction loss had decreased to 50 or 60 decibels. Plaintiff's ability to hear normal conversation with defendant, however, cast doubt on the severity of hearing loss indicated by the audiogram.

Dr. Alper, plaintiff's witness, examined Hayes' right ear some months after the operation and found a 50 percent nerve loss in the right ear and a 40 percent nerve loss in the left ear.

Dr. Alper testified that if Hayes had a severed auditory nerve he would be totally deaf and there would be no response by nerve function. Dr. Alper answered "absolutely not" when asked whether plaintiff had a severed or cut auditory nerve. He said that a wall of bone separates the middle ear from the inner ear, and in order to reach the auditory nerve one would have to cut through that wall of bone. It would be impossible to reach such a nerve with the type of instrument used in the stapes mobilization operation. Dr. Alper testified further that the auditory nerve in Hayes' right ear was not cut or severed prior to the time he examined him.

Dr. Alper said that the medical profession attributed nerve deterioration in these cases to the otosclerosis or to a hypersensitivity of the cochlea in some ears. Dr. Brown attributed the nerve loss to premature aging and the effect of nonuse of the nerve due to advanced otosclerosis in both ears.

In summary, Dr. Alper testified that if there were a hearing

loss following this operation he assumed that something went wrong following surgery. Some ears are very sensitive to trauma and even the usual amount of pressure could produce damage to the inner ear. "We don't know what causes an ear to go down following surgery. We are not quite sure what happens, why it affects one ear and not another."

He was asked whether there would be any reason for such an operation, properly executed, to cause a loss of hearing. Dr. Alper answered, "Apparently there is because it does occur." Such figures vary from 1 percent to 2 percent on such patients. Dr. Alper's own experience was that the hearing of approximately 1.5 percent of his patients became worse after this operation. He did not know the cause for this and stated that this type of operation was "a field that was unknown to all of us."

Plaintiff's second allegation was that Dr. Brown should have recommended operating on the left ear, in which the hearing loss was greater, rather than the right ear. Dr. Alper testified that he preferred to operate on the worse ear first, but that the determination of which ear a doctor would operate on is a matter of choice. He testified that some surgeons operate first on the worse ear and some on the better ear. Dr. Alper admitted that if you have an ear that is so hard of hearing there is absolutely no hope of doing anything for it, then you might consider operating on the better ear first. When Dr. Alper examined plaintiff, he found an air conduction loss in his left ear of approximately 80 percent and a nerve loss of 40 percent. He said that he would not consider plaintiff's left ear as a candidate for the stapes mobilization operation.

Plaintiff's third allegation of negligence was that defendant had damaged nerves controlling the mobility of his tongue and his sense of taste on the rear of his tongue. His own medical witness, however, denied that any nerves controlling the mobility of one's tongue have any connection with the ear or pass through the ear. The chorda tympani nerve in the ear (not the auditory nerve) controls the sense of taste on the front two-thirds of the tongue (not the rear as plaintiff alleged in his petition), and it is the only nerve in the ear which if damaged would affect the taste sensation. Dr. Alper testified that in this stapes mobilization

operation it is normal practice to move aside or even cut this nerve in order to view the operative field. In such cases other nerves usually, though not always, compensate or take over the taste function of the injured nerve within a few months. He testified that he had never seen a case where the taste factor did not return to normal.

The other points made by the plaintiff merely underscored other differences between the operative techniques customarily used by Dr. Alper at the time of this operation and those used by Dr. Brown in this surgery. Dr. Alper administers a blood coagulant for several days prior to the surgery; Dr. Brown did not. Dr. Alper testified that probably more doctors do not prescribe a coagulant than do, and that it is a minor detail. Dr. Alper testified that it is impossible to prevent bleeding and accumulation of some blood in the middle and inner ear.

Plaintiff also challenged Dr. Brown's education, training and experience, but there is no criticism of Dr. Brown's medical qualifications in any of Dr. Alper's testimony.

In summary, plaintiff's own medical witness declined to designate any of the differences in operating technique as anything more than matters of medical judgment for the physician in charge in accordance with accepted medical standards at the time the operation was performed.

Testimony showing a mere difference in views between surgeons as to operating techniques, or as to medical judgment exercised, is insufficient to support an action for malpractice where it is shown that the procedure preferred by each, or the judgment exercised, is an acceptable and customary method of performing the surgery. The evidence does not create a genuine issue of material fact as to whether Dr. Brown exercised the reasonable degree of care and skill required of him as a practicing surgeon.

3. Plaintiff also contends that the doctrine of res ipsa loquitur should be invoked to carry this case to a jury. Georgia courts have expressly ruled, however, that the doctrine of res ipsa loquitur does not apply in a malpractice suit. An unintended result does not raise an inference of negligence. *Howell v. Jackson*, 65 Ga. App. 422, 423, supra. It is presumed that medical or surgical services were performed in an ordinarily skillful manner. *Shea v. Phillips*, 213 Ga. 269 (2), supra.

In *Wimpy v. Rogers,* 58 Ga. App. 67, 69 (197 SE 656), a malpractice suit, the court said that "the rule of res ipsa loquitur does not apply in a case of this kind."

The *Wimpy* case expressly distinguished *Chapman v. Radcliffe,* 44 Ga. App. 649, supra, relied on by plaintiff here. In both *Chapman* and *Howell,* also cited by plaintiff, the Court of Appeals held that there was sufficient evidence of malpractice to submit each case to the jury. The rulings in these cases did not invoke res ipsa loquitur.

In *White v. Executive Committee of the Baptist Convention,* 65 Ga. App. 840 (16 SE2d 605), the plaintiff specifically relied on res ipsa loquitur and testified that she was injured during childbirth in defendant's delivery room and that the defendant negligently permitted her head to strike some hard substance. The court specifically held that the doctrine of res ipsa loquitur was not applicable to the facts in that case.

Again in *Stansfield v. Gardner,* 56 Ga. App. 634, 647 (193 SE 375), involving improper supervision of a mental patient in defendant's hospital, a jury question was presented by the evidence. In relation to res ipsa loquitur, the court held that the "mere fact of injury does not call for the application of the doctrine."

It is recognized by this court that a number of jurisdictions apply the rule of res ipsa loquitur in malpractice suits; plaintiff has cited several of these cases. This court is not persuaded by the foreign cases, however, and we decline to extend the rule of evidence of res ipsa loquitur to a malpractice suit such as this.

We have carefully examined all of the evidence and, after doing so, are fully convinced that it shows no material issue of fact or circumstance from which a jury could have found or inferred that Dr. Brown was negligent. It clearly shows that in performing the operation Dr. Brown exercised that degree of care, skill, and diligence which any competent surgeon would be required to employ in performing this delicate surgery.

*Judgment affirmed. Carlisle, P. J., and Hall, J., concur.*