**John H. STARR and Mrs. John H. Starr,
Appellants,**

v.

**Albert FREGOSI, M. D., Appellee.**

**No. 22308.**

United States Court of Appeals
Fifth Circuit.

Dec. 20, 1966.

Rehearing Denied Jan. 13, 1967.

Warren H. Cobb, Daytona Beach, Fla., Robert W. Cagle, Atlanta, Ga., for appellants.

Wm. H. Schroder, T. M. Smith, Atlanta, Ga., for appellee.

Before BROWN, WISDOM, and THORNBERRY, Circuit Judges.

WISDOM, Circuit Judge:

This medical malpractice case calls for a close study of the record to determine whether the district judge's finding of no negligence was clearly erroneous.

John Starr was a carpenter in Atlanta. Before he moved to Atlanta he had a history of prostate trouble which had been treated successfully with drugs. When his prostatitis flared up again in Atlanta, he consulted the defendant, Dr. Albert Fregosi. Dr. Fregosi treated Starr several times with drugs, but finally suspected that an obstruction of the urinary tract might be the cause of Starr's illness. Dr. Fregosi discussed the problem with Starr, then put him in the hospital for an examination and possible surgery, should the examination reveal an obstruction.

Starr entered the DeKalb General Hospital May 2, 1961. At that time he was forty-six years old. May 4 Dr. Fregosi examined Starr's urinary tract by means of a resectoscope. Finding a median bar obstruction in the prostate area, he removed part of Starr's prostate gland with the resectoscope.[1]

After the May 4 operation, Dr. Fregosi left a catheter in Starr's bladder. When the catheter was removed, Starr could not urinate. The catheter was reinserted. May 12 Dr. Fregosi did another transurethral resection on Starr to remove swollen tissue and other parts of the prostate which were obstructing the urinary canal. Once again a catheter was necessary for a period immediately after the operation. When the catheter was removed, Starr found that he had some difficulty holding water. At the trial, the parties seriously disputed the degree of this incontinence.

In July 1961 Starr became dissatisfied with Dr. Fregosi and went to Drs. Charles Eberhart and J. W. Morgan. These urologists performed certain tests on Starr, visually inspected his urinary tract, treated him with drugs for about eight months, and finally referred him to another Atlanta urologist, Dr. Thomas Florence. July 2, 1962, Dr. Florence, a urologist of some fifteen years experience, examined the patient's urinary tract. He found a stricture of the posterior urethra at the bladder neck and a false passage in the posterior urethra.[2]

1. A resectoscope is an instrument in the shape of a long tube. It has a lens and a light on the end of it, so that when it is inserted into the urinary tract, the physician may see to inspect and to operate. The instrument also has an electrically operated wire loop which may be extended and used to shave tissue from the inside of the prostate gland.

2. The male urinary apparatus consists of the kidneys, the ureters, the bladder, and the urethra. The urethra is the tube leading from the bladder through the prostate gland, the external sphincter muscle and the penis to the external opening. The bladder neck, or vesicle orifice, is the opening from the bladder into the urethra. Moving down from the bladder, the next organ along the urethra is the prostate gland, which surrounds the urethra like a doughnut. Inside the prostate the urethra consists of a smooth muscle tissue which many experts consider to play a significant role in urinary control. This muscle must of necessity be destroyed when the prostate is resected. Just below the prostate is the veru montanum where the reproductive ducts join the urethra. From the bladder to the veru, the urethra is known as the posterior urethra. The veru is a mound of tissue usually visible to the qualified urologist. Immediately below the veru is the membranous urethra which is surrounded by the external sphincter muscle. This muscle is the primary bulwark of male urinary control. Because of its proximity to the external sphincter, the key to urinary control, the veru montanum is considered to be the most important landmark in transurethral surgery. The

(1) Using a urethratome, Dr. Florence performed an internal urethrotomy, cutting the stricture near the bladder neck and (2) using a resectoscope, he performed another transurethral resection to remove the false passage.

In August 1961 Starr moved from Atlanta to Volusia County, Florida. His urologist there was Dr. Michael Blais. Dr. Blais treated Starr medically, but never did examine his urinary tract. When Starr's incontinence did not clear up, Dr. Blais recommended that he go to the University of Missouri where Dr. Ian Thompson performs radical reconstructive operations which sometimes help men with urinary incontinence. Although Starr submitted to the Thompson procedure, the operation was unsuccessful, and Starr is still incontinent.

Starr and his wife sued Dr. Fregosi for malpractice. The case was tried before the court without a jury. The district judge found that Starr had not carried his burden of proving want of due care, and rendered judgment for the defendant.

It is undisputed that at the time of the trial, Starr was suffering from a severe degree of incontinence. He testified that he wore a penile clamp and a plastic bag stuffed with diapers to keep himself dry. He and other lay witnesses testified to several embarrassing incidents. Dr. Thompson testified in his deposition that when he inspected Starr's urinary canal, he discovered that Starr's external sphincter muscle had been damaged, and that in his opinion this damage was the cause of the patient's incontinence. All of the medical experts agreed that any surgeon who might have cut Starr's sphincter muscle during the course of a transurethral resection would have been guilty of incompetence.

The question on appeal is whether negligence, particularly Dr. Fregosi's negligence, caused Starr's incontinence.

I.

The Georgia law, which we must apply in this diversity case, is fairly clear. Ga.Code Ann. § 84–924 provides:

Malpractice of surgery and medicine.—A person professing to practice surgery or the administering of medicine for compensation must bring to the exercise of his profession a reasonable degree of care and skill. Any injury resulting from a want of such care and skill shall be a tort for which a recovery may be had.

The standard of care is that which, "under similar conditions and like surrounding circumstances is ordinarily employed by the profession generally." Hayes v. Brown, Ga.Ct.App. 1963, 108 Ga.App. 360, 363, 133 S.E.2d 102, 104–105. An unexpected or even disastrous result "neither establishes, nor supports an inference of want of proper care, skill or diligence." Wall v. Brim, 5 Cir. 1943, 138 F.2d 478, 480. Res ipsa loquitur does not apply to malpractice cases. Hayes v. Brown, supra. Compare Ybarra v. Spangard, 1944, 25 Cal.2d 486, 154 P.2d 687, 162 A.L.R. 1258. In fact, there is a presumption that "medical or surgical services were performed in an ordinarily skilful manner * * *. [T]he burden is on the one receiving the services to show a want of due care, skill, and diligence." Shea v. Phillips, 1957, 213 Ga. 269, 271, 98 S.E.2d 552, 554.

The plaintiff must prove the defendant's negligence through expert medical testimony. Andrews v. Smith, Ga.Ct.App. 1965, 112 Ga.App. 144, 144 S.E.2d 176. But it is not necessary that the experts testify expressly that the defendant was negligent. *Ibid.*

II.

This case presents two problems: 1) Was Starr's condition caused by negligence? and 2) if so, did Dr. Fregosi

---

idea in resecting the prostate is not to go beyond the veru since to do so would damage the external sphincter.

The entire length of the urethra from the bladder neck through the external sphincter is approximately 3–4 centimeters, although the length varies from individual to individual.

cause it? The district court considered the two questions together and found that the plaintiff had failed to prove that his condition resulted from Dr. Fregosi's negligence. We cannot say, after reviewing the entire record, that the district judge was clearly erroneous.

A. Starr makes several attacks on the findings of the district court. Probably the most important is what he views as Dr. Fregosi's admission that he damaged Starr's sphincter muscle. The "admission" was part of Dr. Fregosi's deposition, in which he stated that "possibly this man had some damage done to his sphincter", and that "there has got to be some inference made that the external sphincter was pathologically compromised." But Dr. Fregosi went on to explain that the sphincter could have been damaged "by irritative factors, infection, irritative factors of just introducing an instrument, catheters being in and out, and the heat of the working element, all these things." He explained that by "compromise" of the sphincter, he meant only that Starr had imperfect control. On numerous occasions Dr. Fregosi denied specifically that he had cut Starr's external sphincter muscle. He testified that he saw the veru montanum intact as he withdrew the resectoscope from Starr's urinary tract after the second operation. Other experts testified that in their opinion, Starr's sphincter had not been damaged in the Fregosi operations. The district judge was entitled to believe this evidence rather than Starr's testimony. We are not prepared, therefore, to say that Fregosi's "admission" compelled the trial judge to find the defendant negligent.

B. Starr claims that the records kept by Drs. Eberhart and Morgan contradict their testimony at the trial, and that the latter should therefore be disregarded. We do not agree that there is such a conflict. At the trial, Dr. Eberhart stated that certain tests he and Dr. Morgan had performed on Starr indicated that Starr's external sphincter had not been damaged. The records support this testimony, although they do contain other matter which might indicate damage to the sphincter. We cannot find the district judge clearly erroneous on this score.

C. The plaintiff contends that Dr. Fregosi's giving him a Cunningham incontinence clamp demands a finding of negligence. The expert witnesses agreed that a patient should not be given an incontinence clamp unless he is incurable. In their opinion the patient would tend to rely too much on the clamp and not exercise the proper muscles which would lead to regaining urinary control. Starr argues, apparently, that Fregosi's giving him a clamp was an admission that Fregosi's operations rendered him incurably incontinent. The argument is inconsistent with Dr. Fregosi's testimony that he gave Starr the clamp to wear only while he was working; that usually the problem of a patient's needing absolute protection did not arise because most prostate patients are older men who are no longer working or otherwise active; and that Fregosi instructed Starr not to use the clamp except when absolutely necessary at work. If the trial judge believed Dr. Fregosi, which he obviously did, the giving of the clamp was not an admission. It does not demand a finding that the district court was clearly erroneous.

D. Starr claims that immediately after the Fregosi operations, Dr. Eberhart saw the same damage to the external sphincter found by Dr. Thompson. Dr. Eberhart's records indicate that when he examined Starr's urinary tract August 5, 1961, he found "at [illegible] o'clock just beneath the internal vesicle orifice there is a depression which is filled with fresh clotted blood". This, Starr claims, was the damage Dr. Thompson observed. The trial judge properly declined to accept this theory. The clotting Dr. Eberhart observed was in the vicinity of the bladder neck, on the other side of the prostate from the external sphincter muscle which Dr. Thompson found had been damaged.

E. Starr asserts that the trial court found that he had been injured by medical incompetence and malpractice, and entered judgment for Dr. Fregosi only

because of uncertainty as to whether Dr. Fregosi or Dr. Florence had caused the injury. He therefore argues strongly Dr. Florence's innocence. Starr misinterprets the trial court's decision. The district judge did say that "The evidence clearly indicates that, after the many surgical procedures performed on plaintiff John Starr over a more than 2-year period, he is suffering from a condition that approaches total incontinence." Yet he went on to point out that incontinence can occur after a transurethral resection without negligence or medical explanation. "The evidence," he concluded, "does not show that the present total incontinence was caused by defendant's two surgical procedures or that these procedures were performed without due care, due skill and diligence." This finding is consistent both with an injury caused by someone else's negligence and with one caused by no negligence whatsoever.

F. Starr complains of the trial court's misconception of the terms "stress incontinence" and "total incontinence". While it is obvious that the terms are not susceptible of exact definition and that at the trial they caused considerable confusion, we do not think the confusion misled the trial judge into an erroneous finding. Certainly there was ample evidence to support the finding that Starr retained some control over his urinary function. For example, Starr told Dr. Eberhart that if he arose from a sitting position and became ambulatory, he could control himself for about an hour, but if he remained ambulatory after urinating, he lacked complete control. If the district judge found, as he did, that Starr could control himself in some circumstances, we do not see how the degree of incontinence is related to the question of negligence. At any rate, we cannot say that the use of the terms "stress incontinence" and "total incontinence" resulted in error.

G. Starr next argues that the district judge should be reversed because he disregarded all of the lay testimony to the effect that Starr was totally incontinent after the Fregosi operations. First we note that Georgia law requires malpractice to be proved by expert testimony. Andrews v. Smith, supra. In addition, we see no reason that we should require the judge to give controlling weight to the self-serving testimony of the plaintiff, his wife and friends.

H. Finally, the plaintiff attacks Dr. Fregosi's competence, showing that he had practiced urology for only seven months prior to operating on Starr and that he was not certified by the American Board of Urology. Under Georgia law, however, even the failure to have a license to practice medicine will not of itself authorize an inference of negligence. Andrews v. Lofton, Ga.Ct.App. 1950, 80 Ga.App. 723, 57 S.E.2d 338.

None of Starr's other attacks on the district court's finding needs specific mention. We have read the entire record in this case and are not left with the firm conviction that error has been committed. There was ample evidence that in a small percentage of cases incontinence of varying degrees may result without negligence or explanation after a transurethral resection. There was also a great deal of testimony tending to show that Starr's sphincter had not been damaged after Dr. Fregosi's operations. Acceptance of either state of the facts would lead to a finding that Dr. Fregosi had not been negligent.

This is a hard case and a close case. We are not free to substitute our judgment for that of the district court. On the facts, as they appear to us, we cannot say that the judge below was clearly erroneous. His judgment is therefore

Affirmed.