**Mary Jane CONNORS and David M. Bliss, Plaintiffs,**

v.

**UNIVERSITY ASSOCIATES IN OBSTETRICS AND GYNECOLOGY, INC., Defendant.**

**Civ. A. No. 89–294.**

United States District Court,
D. Vermont.

July 9, 1991.

Richard E. Davis, Richard E. Davis Associates, Barre, Vt., for plaintiffs.

John Sartore, Paul, Frank and Collins, Burlington, Vt., for defendant.

## OPINION AND ORDER

BILLINGS, Chief Judge.

On March 29, 1991, the above-named plaintiffs moved for a new trial pursuant to Fed.R.Civ.P. 59. The defendant opposed the motion on April 9, 1991. On April 22, 1991, the plaintiffs filed a reply in support of their motion, and the defendant entered a surreply on May 6, 1991. Based on our consideration of the foregoing, the plaintiffs' motion for a new trial is GRANTED.

### I. Background

Mary Jane Connors and David M. Bliss, a married couple, sought the medical services of University Associates in Obstetrics and Gynecology, Inc. (University Associates) for Connors after she was unable to become pregnant. In October, 1986, physicians employed by University Associates told Connors that she suffered from severe tubal and peritubal adhesive disease and they recommended that certain exploratory operative procedures be conducted, among them a hysteroscopy and laparascopy. Connors consented to the surgery.

On October 28, 1986, Dr. John Brumsted performed the surgery, assisted by Drs. Barthold and Nakajima. Within a few days thereafter, while still in the hospital, Connors began to experience severe pain in her left leg and hip. This pain has continued until the present time and has been accompanied by permanent loss of function of the leg. Connors and her husband brought this action against University Associates, alleging medical malpractice on the part of defendant's agents, servants, and employees.

At trial, plaintiffs attempted to show that the use of an O'Connor–O'Sullivan self-retaining retractor caused an entrapment of the lateral femoral cutaneous nerve (LFCN) in Connors' leg and produced her injury. A self-retaining retractor is a device inserted by the surgeon once an incision, in this case a Pfannenstiel incision, has been made. It keeps open the operative area while the surgeon is at work. Experts on both sides agreed that the standard of care in the use of the retractor included using pads to keep the retractor off of the psoas muscle, feeling under and around the retractor blades to make sure that they are not impinging on various structures, and checking the blades during surgery and releasing the pressure occasionally to make sure that the retractor is not pressing on nerves or muscles. Experts disagreed about whether Connors' injury could have happened even if this standard of care had been followed.

Plaintiffs' main witness was Dr. Roger J. Ferland, an expert who testified by deposition. Dr. Ferland testified to the standard of care required in the use of the self-retaining retractor and to his opinion that the most likely cause of Connors' injury was negligent use of the retractor. When asked to assume that Connors' LFCN was abnormally displaced within her pelvis, Ferland maintained that the circumstances of the injury still indicated to him that the standard of care in the use of the retractor had been breached.

Of the attending surgeons, only Dr. Brumsted testified. He testified on behalf of defendant to the standard of care in using a self-retaining retractor but stated that he could not recall specifically whether or not he had used a retractor during Connors' surgery. He testified that if he had used a retractor during the surgery that he had followed appropriate standards of care in the use of the instrument and that Connors' injury was due to the fact that her LFCN followed an anatomically abnormal course. Four other experts testified on behalf of defendant to the applicable standards of care in the use of self-retaining retractors and to their beliefs that Dr. Brumsted probably adhered to those standards during Connors' surgery if he had used a retractor. These experts also testified to the extreme rarity of Connors' injury, to the abnormal positioning of Connors' LFCN, and to the fact that nerve injuries

such as Connors' are an inherent risk of the type of surgery that she underwent.

After considering the evidence, the jury returned a verdict in favor of the defendant. Plaintiffs contend that they are entitled to a new trial for several reasons, including (1) that the verdict was against the weight of the evidence; (2) that the court improperly refused to give the jury a charge of res ipsa loquitur; and (3) that recently discovered facts about the occupation of the jury foreperson and certain of her relatives deprived plaintiffs of a fairminded impartial evaluation of their evidence. Because we agree that plaintiffs' second argument warrants a new trial, we discuss only that ground.

## II. Discussion

### A. Introduction

■■■ The doctrine of res ipsa loquitur refers to a form of circumstantial evidence that allows a jury to infer from the circumstances of an injury that the defendant has been negligent. See Cyr v. Green Mountain Power Corp., 145 Vt. 231, 235, 485 A.2d 1265 (1984) (citing Prosser and Keeton on the Law of Torts § 40, at 257–58) (W. Keeton 5th ed. 1984). The doctrine is based in probabilities—it may be invoked where an accident is of such a nature that it can be said that it was probably the result of negligence by someone and that the defendant is probably the one responsible. See Siverson v. Weber, 57 Cal.2d 834, 22 Cal.Rptr. 337, 337, 372 P.2d 97, 97 (1962). Application of the doctrine does not shift the burden of proof to the defendant, but merely establishes a prima facie case of negligence that the jury is free to accept or reject. Cyr, 145 Vt. at 235, 485 A.2d 1265.

Although the Vermont Supreme Court applied res ipsa loquitur as early as 1894, see Houston v. Brush, 66 Vt. 331, 29 A. 380 (1894), the Court has not addressed the question of whether the doctrine should be applied to medical malpractice actions. Most courts considering the question have concluded that there are at least some circumstances under which the doctrine may be applied to medical malpractice. See,

e.g., Hunter v. Robison, 488 S.W.2d 555, 560 (Tex.Civ.App.1972); but see Hayes v. Brown, 108 Ga.App. 360, 133 S.E.2d 102, 107 (1963) (stating that Georgia courts have expressly ruled that res ipsa loquitur does not apply in medical malpractice suits).

When Vermont has applied the doctrine to contexts other than medical malpractice, it has utilized elements similar to those used in other jurisdictions. See, e.g., Morgan v. Children's Hosp., 18 Ohio St.3d 185, 480 N.E.2d 464, 466 (1985). The state supreme court has required that the following four elements be satisfied:

1. A legal duty owing from the defendant to exercise a certain degree of care in connection with a particular instrumentality to prevent the very occurrence that has happened.

2. The subject instrumentality at the time of the occurrence must have been under the defendant's control and management in such a way that there can be no serious question concerning the defendant's responsibility for the misadventure of the instrument.

3. The instrument for which the defendant was responsible must be the producing cause of the injury.

4. The event which brought on the plaintiff's harm is such that would not ordinarily occur except for the want of requisite care on the part of the defendant as the person responsible for the injuring agency.

Cyr, 145 Vt. at 235–36, 485 A.2d 1265.

In the medical malpractice context, it is the fourth element that has spawned conflicting decisions and that requires analysis. In the case before us, the plaintiffs relied upon the expert testimony of Dr. Ferland for evidence that Connors' injuries would not ordinarily occur except for the want of requisite care on the part of the defendant. Of the jurisdictions applying res ipsa loquitur to medical malpractice, several jurisdictions have limited the doctrine to only those cases in which a layperson is able to make such an inference from his or her own experience or observation. See, e.g., Riedinger v. Colburn, 361

F.Supp. 1073 (D.Idaho 1973); *Meda v. Brown*, 318 Md. 418, 569 A.2d 202 (1990); *Orkin v. Holy Cross Hosp. of Silver Spring, Inc.*, 318 Md. 429, 569 A.2d 207 (1990). If the jury is unable to draw an inference of negligence without the aid of expert testimony, courts in these cases have declined to apply the doctrine. *See, e.g., Meda*, 569 A.2d at 205. Other courts, although declining to lay down a rule disallowing expert testimony, have concluded that the doctrine was inapplicable to the case before them. *See, e.g., Siverson*, 22 Cal.Rptr. at 339, 372 P.2d at 99.

In contrast, a number of jurisdictions apply the doctrine to cases in which the jury is unable to draw an inference of negligence from its own experience, but in which the plaintiff has presented expert medical testimony sufficient to support such an inference. *See Morgan*, 480 N.E.2d at 466 n. 2. Courts in these cases have reasoned that in certain complex medical malpractice actions, the lay person is not capable of inferring that an injury would not happen in the absence of negligence, but that an injured person should nonetheless not be deprived of the benefit of the doctrine if an expert could draw such a conclusion. *See, e.g., Buckelew v. Grossbard*, 87 N.J. 512, 435 A.2d 1150, 1157–58 (1981).

Because plaintiffs rely upon the expert testimony of Dr. Ferland to support their claim that a res ipsa loquitur charge should have been given, we must decide: (1) whether Vermont would first apply res ipsa loquitur to medical malpractice actions in which a lay person is able to say of his or her common knowledge or experience that an injury would not have occurred in the absence of negligence; (2) whether Vermont would apply the doctrine to cases in which the common knowledge of lay persons is insufficient to make such a determination but in which it is common knowledge among experts that such an injury would not occur without negligence; and (3) assuming that Vermont would apply the doctrine, whether the elements of the doctrine are satisfied such that it should have been applied in this case.

**B. Res Ipsa Loquitur Based Upon Common Knowledge of Laypersons**

The argument for prohibiting medical negligence to be presumed or inferred by the jury at all posits that there are so many intangibles and uncertainties involved in medicine that the occurrence of a bad result cannot justify an inference of negligence. *See Jones v. Harrisburg Polyclinic Hosp.*, 496 Pa. 465, 437 A.2d 1134, 1137 (1981). It includes the notion that all features of medical treatment, especially the standards of care required by physicians, can be interpreted and judged by physicians only. *See id.; see also Salgo v. Leland Stanford Jr. Univ. Bd. of Trustees*, 154 Cal.App.2d 560, 317 P.2d 170, 175 (1957).

Though many courts profess agreement with this reasoning, few have established a blanket rule against application of the doctrine. *See, e.g., Walker v. Rumer*, 51 Ill. App.3d 1005, 9 Ill.Dec. 724, 367 N.E.2d 158 (1977); *but see Hayes*, 133 S.E.2d at 107. Instead, they have created numerous instances such as where the negligence of the doctor is so obvious or the conduct of the doctor so grossly remiss in which they will allow application of res ipsa loquitur. *See Walker*, 9 Ill.Dec. at 726, 367 N.E.2d at 160. For example, in *Hunter v. Robison*, the court stated that res ipsa loquitur does not apply to medical malpractice unless

> the injuries are 'obviously the result of someone's negligence,' and obviously caused by use of external force applied while the patient lay unconscious, or 'where the want of care or skill is so obvious as to be within the comprehension of a layman,' or where the negligence 'is obvious to the untrained layman, such as leaving surgical instruments or sponges in the incision, or operating on the wrong portion of the body.'
>
> 488 S.W.2d at 560 (cites omitted).

In the case before it, in which a woman undergoing a hysterectomy suffered permanent paralysis below the waist, the court held that the test for the doctrine had not been met because the injury could not be considered an obvious injury. *See id.*

The argument for prohibiting lay persons from inferring negligence simply because the case involves medical science seems to us an inflexible one. Despite intangibles and uncertainties in medicine, there are certain injuries that common experience and knowledge tell us would not have occurred in the absence of negligence. When a surgeon leaves a sponge in the patient's interior or injures an inappropriate part of the anatomy, the thing speaks for itself without the aid of an expert. Prosser § 39, at 256–57 (and cases cited therein). If a medical injury is such an injury, then there is no difference between applying the doctrine to medical malpractice and applying it to a barrel of flour falling out of a window. The applicability of the rule should not automatically be precluded simply because it relates to a medical procedure; rather, the range of application should be as broad as the possible events that justify an inference of negligence. *See id.* at 244.

Moreover, if one examines the procedural policy behind res ipsa loquitur—placing the burden of producing evidence on the party who has superior knowledge about the causative circumstances of an injury—the doctrine is perfectly suited for the medical malpractice context. *See Buckelew,* 435 A.2d at 1156. In the typical medical case, the patient is unconscious and has no idea who, how, or what injured her. The well-documented "conspiracy of silence" among physicians may perpetuate the patient's ignorance. *See Jones,* 437 A.2d at 1138. As stated in the seminal *Ybarra v. Spangard,* 25 Cal.2d 486, 154 P.2d 687, 689 (Ca.1944),

> it is difficult to see how ... [res ipsa loquitur] can, with any justification, be so restricted in its statement as to become inapplicable to a patient who submits himself to the care and custody of doctors and nurses, is rendered unconscious, and receives some injury from instrumentalities used in his treatment. Without the aid of the doctrine a patient who received permanent injuries of a serious character, obviously the result of someone's negligence, would be entirely unable to recover unless the doctors and nurses in attendance voluntarily chose to disclose the identity of the negligent person and the facts establishing liability.

Thus, as with other applications of res ipsa loquitur, application of the doctrine to medical malpractice merely attempts to equalize what is typically an unequal relationship.

A review of Vermont law indicates that Vermont has essentially applied res ipsa loquitur to medical malpractice by allowing plaintiffs to avoid producing expert testimony where jurors can infer on the basis of their experience that the defendant has been negligent. *See Larson v. Candlish,* 144 Vt. 499, 502, 480 A.2d 417 (1984). The state supreme court has stated that although Vermont's medical malpractice statute requires that malpractice be proven by expert testimony, "[w]e have established an exception to the rule requiring expert testimony in medical malpractice cases where the alleged violation of the standard of care is so apparent that it may be understood by a lay trier of fact without the aid of an expert." *Id.* The referenced exception comes from *Largess v. Tatem,* 130 Vt. 271, 279, 291 A.2d 398 (1972), in which the Court stated that "when a physician's lack of care has been such as to require only common knowledge and experience to understand and judge it, expert medical testimony is not required to establish that care."

Vermont has thus allowed permissive inferences of negligence based upon jurors' common knowledge and experience. Assuming that the state supreme court will follow the pattern of other jurisdictions, the current exception is one step removed from adopting a res ipsa loquitur jury charge for medical malpractice cases. *See, e.g., Jones,* 437 A.2d at 1137.

■ We therefore conclude that, assuming the other elements of the doctrine are satisfied, the Vermont Supreme Court would apply res ipsa loquitur to medical malpractice actions where a layperson is able to say of his or her common knowledge or experience that the event causing injury would not have occurred in the absence of negligence.

## C. Res Ipsa Loquitur Based Upon Expert Testimony

There is less agreement among the cases about whether experts within a specialized field may testify that they consider it common knowledge that an injury does not happen in the absence of negligence. *Compare Morgan,* 480 N.E.2d at 466 *with Orkin,* 569 A.2d at 209. Although a leading Annotated Law Review article maintains that the general rule does not allow the doctrine under such circumstances, several commentaries accept the proposition that expert testimony may supply the basis for a res ipsa loquitur instruction. *See* Annotation, *Physicians and Surgeons: Res Ipsa Loquitur, or Presumption or Inference of Negligence, in Malpractice Cases,* 82 A.L.R.2d 1262, 1274 (1962); *cf.,* Restatement (Second) of Torts § 328D comment d (1965). The Restatement, in discussing the basis for concluding that an injury is of a type that ordinarily does not happen in the absence of negligence, states:

> In the usual case the basis of past experience from which this conclusion may be drawn is common to the community, and is a matter of general knowledge.... It may, however, be supplied by the evidence of the parties; and expert testimony that such an event usually does not occur without negligence may afford a sufficient basis for the inference. Such testimony may be essential to the plaintiff's case where, as for example in some actions for medical malpractice, there is no fund of common knowledge which may permit laymen reasonably to draw the conclusion.

Restatement (Second) of Torts § 328D comment d. Similarly, Prosser and Keeton on the Law of Torts § 39, at 257, states that although there are some medical and surgical errors on which any lay person is competent to pass judgment, "medical experts may provide a sufficient foundation for res ipsa loquitur on more complex matters, with testimony that the plaintiff's particular adverse result does not ordinarily occur when due care is used."

The same policy concerns underlying the application of res ipsa loquitur to cases that fall within the common knowledge of lay persons often motivate courts to expand that application to permit expert testimony to provide the inference of negligence. *See Jones,* 437 A.2d at 1138–39. In adopting a rule allowing expert testimony to provide the inference of negligence, the Pennsylvania Supreme Court stated that there was no longer a need to refuse to allow circumstantial proof of negligence where the evidence provided proof of the reliability of the inference to be drawn. *See id.* at 1138. The court pointed to the obvious need for the inference in situations in which the plaintiff was unconscious and submitted herself to the care and custody of doctors and was injured. *See id.* at 1139 (citing *Ybarra,* 154 P.2d at 689). In adopting its new rule, the court stated that courts "must be responsive to new conditions and to the persuasion of superior reasoning" and must keep abreast of changes in society. *Id.* at 1138, 1139.

Cases in which courts have allowed expert testimony to support a charge of res ipsa loquitur often involve injuries within the area of treatment such that a layperson is unable to say whether an injury is an inherent risk of surgery. *See, e.g., Fehrman v. Smirl,* 20 Wis.2d 1, 121 N.W.2d 255 (1963). In *Fehrman v. Smirl,* 121 N.W.2d at 267, the Wisconsin Supreme Court stated that cases in which negligence was within the common knowledge of jurors were readily distinguishable from its own in which the injured area—the sphincter—was only about one and a half inches from the prostate gland being operated on. The court adopted a rule allowing a res ipsa loquitur instruction to be grounded upon expert testimony, saying that it could not perceive any reason why expert testimony should not be allowed when the procedural effect of the doctrine would be merely to create a permissible inference. *See id.* at 268. Similarly, in a case in which a patient's bladder was mistakenly cut during an exploratory laparatomy (a surgical procedure involving entry into the abdominal cavity through an incision in the loin or flank), the New Jersey Supreme Court held

that the common knowledge of jurors was insufficient to infer that the cut raised an inference of negligence and that therefore expert testimony would be allowed. *See Buckelew,* 435 A.2d at 1158.

Even when injuries occur outside the area of treatment, courts have sometimes concluded that the inference of negligence is outside the ken of lay jurors and have allowed expert testimony to support such an inference. In *Horner v. Northern Pac. Beneficial Ass'n Hosps., Inc.,* 62 Wash.2d 351, 382 P.2d 518 (1963), a patient came out of abdominal surgery with a paralyzed arm. The Washington Supreme Court stated that although to emerge from abdominal surgery with a paralyzed arm certainly seemed an extraordinary occurrence that would not occur without negligence, it could well be that such injuries are a risk of the type of surgery. *See id.* 382 P.2d at 524. The court held that it would allow expert testimony in "esoteric fields" such as the one before it (in addition to the jurors' common knowledge and experience) to support the inference of negligence. *See id.*

Those cases prohibiting res ipsa loquitur from being grounded upon expert testimony have adhered to traditional res ipsa loquitur concepts that the conclusion that an event does not occur without negligence is based upon experience and is one common to the whole community. *See, e.g., Orkin,* 569 A.2d at 209; Prosser § 39, at 247. Because the ordinary medical malpractice case requires that scientific knowledge and the standard of care be established by expert witnesses, these cases have concluded that res ipsa loquitur is inappropriate in such a context. *See Orkin,* 569 A.2d at 209.

Cases on this side of the argument limit the trier of fact to inferring negligence from the facts surrounding the injury rather than from the testimony of experts. In *Orkin,* 569 A.2d at 208, the Maryland Court of Appeals distinguished between an inference of negligence drawn by an expert that could not properly be drawn by a lay juror, and an inference of negligence that may properly be drawn by a lay juror from

the facts, unaided by expert testimony. The court stated that although the first example might sound like res ipsa loquitur, the doctrine in its strictest sense would be limited to the second example. *See id.* The case involved a patient who underwent surgery for a perforated ulcer and received injuries to the median, ulnar, and radial nerves on the right side of her body, allegedly as a result of malpositioning on the operating table by the anesthesiologist. *See id.* The court stated:

> This is not an 'obvious injury' case. Resolution of the issues of negligence and causation involved in a case of this kind necessarily requires knowledge of complicated matters, including human anatomy, medical science, operative procedures, areas of patient responsibility, and standards of care. Complex issues of the type generated by a case of this kind should not be resolved by laymen without expert assistance. Res ipsa loquitur does not apply under these circumstances.

*Id.*

See also *Meda v. Brown,* decided the same day as *Orkin,* in which the court stated that

> [r]es ipsa loquitur, as we now utilize that concept in the law of negligence, means that in an appropriate case the jury will be permitted to infer negligence on the part of a defendant from a showing of facts surrounding the happening of the injury, unaided by expert testimony, even though those facts do not show the mechanism of the injury or the precise manner in which the defendant was negligent.

569 A.2d at 205.

In considering what rule Vermont would adopt, it is clear that injuries in cases such as *Fehrman, Buckelew,* and *Orkin* do not fall within the common knowledge or experience of jurors. However, as stated in *Buckelew,* 435 A.2d at 1158, the probability of negligence required to support a charge of res ipsa loquitur in cases like these might exist independently of the awareness or common knowledge of the lay community. In an appropriate case, expert testimo-

ny may be as probative of the existence of negligence as the common knowledge of lay persons. *Id.* If such is the case, we see no basis for refusing to permit a jury to draw an inference of negligence from expert testimony. The fact that the negligence at issue may be more subtle or complex than leaving a sponge in the body should not be controlling if the overarching requirement of the doctrine—that there is a body of experience that teaches that the injury would not have happened without negligence—is satisfied.

We note, moreover, that in this era of constantly developing medical science, cases in which injuries bespeak negligence to the average person occur less and less and complex cases predominate. If courts refuse to allow experts to testify to what is common knowledge within their fields, then they are not being responsive to new conditions nor are they keeping abreast of changes in society. *See Jones,* 437 A.2d at 1138, 1139. Certainly the res ipsa loquitur doctrine must be applied on a case-by-case basis and it may never be applied simply because a patient has experienced a bad or unlikely result from treatment. *See Siverson,* 22 Cal.Rptr. at 339, 372 P.2d at 99. Yet a rigid rule that precludes expert testimony from supporting a res ipsa loquitur charge will exclude the doctrine from nearly all medical malpractice cases. *See Morgan,* 480 N.E.2d at 466.

We believe that the Vermont Supreme Court would find this reasoning persuasive. In *Lillicrap v. Martin,* — Vt. ——, ——, 591 A.2d 41, 46–47 (1989), *as revised on reargument,* 2 Vt.L.W. 82 (Mar. 1, 1991), the Court ruled that "discovery of the injury" in Vermont's medical malpractice statute means discovery of the injury and the fact that the injury may have been caused by the defendant's negligence or other breach of duty. The trial court had interpreted the statute as encompassing only discovery of the injury and not the expanded concept of discovery of the injury plus its cause. *See id.* 591 A.2d at 45. Such holding effectively barred plaintiff's cause of action before the plaintiff could have discovered the nature and extent of his injury or that the defendant had been negligent.

In rejecting the trial court's interpretation, the state supreme court favored a policy of not allowing defendants to avoid liability before plaintiffs have had a realistic opportunity to discover the circumstances of the medical malpractice. *See id.* 591 A.2d at 46. Similarly, if the Vermont Supreme Court were to rule on the expert testimony question, it likely would rule so as not to allow defendants to avoid liability simply because the defendant's negligence is outside the ken of lay jurors. It likely would rule so as to allow plaintiffs a charge of res ipsa loquitur where the nature of the expert evidence provides the requisite reliability of the inference sought to be drawn. *See Jones,* 437 A.2d at 1138.

We thus conclude that where there is no fund of common knowledge that would permit lay persons to draw the conclusion that an action bespeaks negligence that Vermont would allow expert testimony to supply the inference. Assuming that the other elements of the doctrine are met, we conclude that Vermont would allow expert testimony to support a charge of res ipsa loquitur.

### D. Application of Res Ipsa Loquitur to the Case at Bar

Whether a plaintiff relies on the common knowledge of lay persons or the testimony of experts, it is for the court in the first instance to determine whether the plaintiff has made out a prima facie case to support a charge of res ipsa loquitur. Prosser § 39, at 243. Assuming that Vermont would simply extend the elements of res ipsa loquitur outlined in *Cyr,* 145 Vt. at 235–36, 485 A.2d 1265, to the medical malpractice context, we consider whether those elements have been satisfied in this case.

The first element outlined in *Cyr* requires that there be a legal duty owing from the defendant to exercise a certain degree of care in connection with the injuring instrumentality. *See id.* at 235–36, 485 A.2d 1265. A health care professional has a legal duty to exercise the degree of care ordinarily exercised by reasonably skillful,

careful, and prudent health care professionals engaged in a similar practice under the same or similar circumstances. *See* 12 V.S.A. § 1908; *see also Largess*, 130 Vt. at 277, 291 A.2d 398. Thus, the defendant, through its physician employees, owed a legal duty to Connors to exercise the degree of care in connection with the use of the retractor as would similarly situated health care professionals.

The second *Cyr* element requires that the instrumentality causing the injury have been under the defendant's control and management such that there can be no serious question concerning the defendant's responsibility for the misadventure of the instrument. *See Cyr*, 145 Vt. at 235, 485 A.2d 1265. Plaintiffs easily satisfy this element. Connors was unconscious throughout the entire surgery so that there is no question of any responsibility on her part. Additionally, defendant's agents had complete control over Connors and the instrumentalities of surgery.

Plaintiffs also satisfy the third element, that the instrument for which the defendant was responsible be the producing cause of the injury. *See id.* at 236, 485 A.2d 1265. Plaintiffs through Dr. Ferland offered sufficient evidence that the retractor was the producing cause of the injury. *See* Deposition of Dr. Ferland, pp. 40, 75–76, 96. Although there were other theories proffered for the cause of Connors' injury, including compression of the nerve from keeping the patient in the dorsal lithotomy position too long, entrapment of the nerve in the course of suturing, and the use of a carbon dioxide laser, plaintiffs need not offer conclusive proof that the retractor caused the injury. *See Cyr*, 145 Vt. at 234, 485 A.2d 1265 (stating that "[i]f a plaintiff presents evidence which satisfies the elements of res ipsa loquitur, even in the face of conflicting evidence, the jury must be given the opportunity to infer negligence on the part of the defendant."). Evidence of other causes of the injury simply goes to rebut plaintiffs' theory. *See id.; Morgan*, 480 N.E.2d at 467–68.

As for the fourth element, that the event that brought on the plaintiff's harm is such that would not ordinarily occur except for the want of requisite care on the part of the defendant, we conclude that plaintiffs have satisfied this element as well. *See Cyr*, 145 Vt. at 236, 485 A.2d 1265. Dr. Ferland testified that the requisite care in connection with the use of the retractor includes caution in opening the blades of the retractor so as not to exert too much force, insuring that the blades are not impinging on the psoas muscle, the pelvic wall, or various nerves, and releasing the retractor during surgery and altering the position of the retractor blades so as to avoid prolonged pressure on various structures. Deposition of Dr. Ferland, pp. 34, 54–55, 79, 100. He testified that it is common knowledge among experts that Connors' injury indicates a lack of compliance with these standards of care. To support his conclusion, Dr. Ferland made textual references to nine treatises or articles. *See id.* at 23, 25–26, 26–27, 31–32; 83. He also referred to his own experience—the very crux of the res ipsa loquitur doctrine—for his position that the injury would not have occurred in the absence of negligence:

Q:  .... What use have you made of these different articles in formulating opinions that you've prepared for this case?

A:  These articles only serve to confirm my original knowledge of this potential injury from my residency training.

\*       \*       \*       \*       \*       \*

Q:  When you referred to your original training then, were you referring to textbooks that you read as a medical student?

A:  No. Largely to the admonitions of the attending surgeons who taught me as a resident to be very careful in using these self-retaining retractors because they were aware of the potential for nerve injury, and it became part of my own personal routine when I use them.

Q:  In the course of your training did any of the surgeons who trained you refer specifically to the danger of injury to the LFCN as opposed to the femoral nerve through the use of self-retaining retractors or dorsal lithotomy position?

A: Yes.

Q: And how did they refer to the LFCN?

A: By its name. You know, the warnings would be that one must be cautious in getting the blades of the retractor up off the psoas muscle and that not—and one should be cautious not to exert too much force in opening the blades to avoid injury to both of those nerves as well as others in the pelvis.

*Id.* at 32, 33–34 [emphasis added].

And later in his testimony, Dr. Ferland stated:

A: .... In my opinion the most likely cause of injury is pressure from an improperly placed and padded self-retaining retractor.

Q: Why do you hold that opinion?

A: Because this is an observed and known potential complication of the use of these retractors, and it is the most likely scenario given the type of surgery and the instruments used.

*Id.* at 76 [emphasis added].

And still later:

A: .... [M]y personal habit is to avoid the use of self-retaining retractors for the most part.

Q: Why is that?

A: To avoid these potential injuries. I think that nerve injuries are clearly possible and documented in the literature....

*Id.* at 78 [emphasis added].

And finally:

A: .... [Even if the LFCN was medially displaced,] [i]t is in a position even closer to the femoral nerve, and in this position the use of a self-retaining retractor, if the blades were perhaps at this point, could put pressure on that nerve between the blade of the retractor and the pelvic side wall just as it could the femoral nerve. And there are many case reports of that....

*Id.* at 97 [emphasis added].

Rather than stating conclusory allegations, Dr. Ferland explicitly referred to textual materials and his experience to establish the common knowledge of experts. The references are in fact far more persuasive than some of the cases that have allowed expert testimony on this subject. *See, e.g., Buckelew,* 435 A.2d at 1154. In *Buckelew,* 435 A.2d at 1154, the expert testified simply that the type of surgery at issue required that a physician be "particularly careful" to avoid the injury that had occurred and that it was his opinion that the physician had not exercised the requisite degree of care. The court held that "[a]lthough the questions put to and answers given by Dr. Tuby did not fit precisely into the classic mold of interrogation for creation of a res ipsa loquitur case, nevertheless a fair reading of the doctor's testimony indicates that in his opinion it is common knowledge within the· medical community that the type of accident that took place in this case does not ordinarily occur in the absence of the surgeon's negligence." *Id.* at 1158.

Moreover, although it was not required that plaintiffs rebut defendant's defense, *see Morgan,* 480 N.E.2d at 467, Dr. Ferland testified that even if Connors' LFCN was abnormally placed as contended that the circumstances of Connors' injury still bepoke negligence.

Q: .... If we assume that [Connors' LFCN is medially displaced within the pelvis], under those circumstances do you think that the surgeons could perform the Pfannenstiel, use the self-retaining retractors, follow standards of care and nevertheless injure the LFCN?

A: I find it hard to imagine that they could even if the nerve was medially displaced.

Q: And why is that?

A: Because the nerve has to be pinched between the retractor blade and some fixed pelvic structure. Even if it was medially displaced, that could occur with the improper use of a self-retaining retractor. Simply stated, when a self-retaining retractor is used, the pressure on the adjacent lateral structures should be absent or minimal to avoid injury. So even if the nerve was medially displaced somewhat, I think it still—the injury

588

could be avoided if the proper care was taken.

\* \* \* \* \* \*

Q: .... [I]s it nevertheless possible that in surgery like this, if the LFCN is medially displaced within the pelvis, that the surgeons can follow standards of care and nevertheless injure that nerve? Number one, is it possible?

A: I would say no. I mean, if they followed the standard of care—even if it was medially displaced it should not have been injured because the standard of care involves ensuring that nothing is caught beneath the blade of the retractor, whether it's medial or lateral.

Deposition of Dr. Ferland, pp. 63–64; *see also* p. 94.

■ We thus conclude that the case before us satisfies the requirements for a charge of res ipsa loquitur as those elements have been laid out by the Vermont Supreme Court. As for the effect of our holding, a new trial on the basis of erroneous jury instructions is appropriately granted where it is clear that the jury was not adequately instructed on issues essential to the case. *See Hilord Chemical Corp. v. Ricoh Electronics, Inc.*, 875 F.2d 32, 39 (2d Cir.1989). In this case, the law by which the jury judged the circumstances of Connors' injury was the essence of the case. The jurors should have been given a charge of res ipsa loquitur for this purpose. Failure to give such a charge was a substantial and prejudicial error.

### III. Conclusion

Based on the foregoing, we conclude: (1) that assuming the other elements of the doctrine have been satisfied, Vermont would apply res ipsa loquitur to medical malpractice actions where the common knowledge or experience of lay persons is sufficient to establish that an injury would not have occurred in the absence of negligence; (2) that if the other elements of the doctrine are satisfied, Vermont would also apply res ipsa loquitur to medical malpractice actions where expert testimony establishes that it is common knowledge among experts that an injury would not have hap-

pened in the absence of negligence; and (3) that the court incorrectly declined to give an instruction of res ipsa loquitur in this case with the result that the jury was not adequately instructed on issues essential to the case.

Plaintiffs' motion for a new trial is GRANTED.

SO ORDERED.